381 A.2d 849

**COUNTY OF ALLEGHENY, Appellee,**

v.

**ALLEGHENY COUNTY PRISON EMPLOYEES INDEPENDENT UNION, Appellant.**

Supreme Court of Pennsylvania.

Argued Sept. 20, 1976.

Decided Dec. 1, 1977.

Rehearing Denied Feb. 3, 1978.

Frank P. G. Intrieri, Jubelirer, McKay, Pass & Intrieri, Ernest B. Orsatti, Pittsburgh, for appellant.

Stephen A. Zappala, County Sol., Henry W. Ewalt, Sp. Labor Counsel, Pittsburgh, for appellee.

Before JONES, C. J., and EAGEN, O'BRIEN, ROBERTS, POMEROY and MANDERINO, JJ.

## OPINION OF THE COURT

POMEROY, Justice.

The question presented by this appeal is whether, in an arbitration of a grievance by public employees under a collective bargaining agreement, an award sustaining the grievance may properly be based on a practice of the parties which had obtained during a period prior to the agreement. Under the facts of this case and in light of the terms of the agreement, which contains no past practice clause nor any mention of the practice in question, but does contain an integration clause, we answer the question in the negative.

This case was initiated by the appellant, Allegheny County Prison Employees Independent Union (hereinafter "Union") when on May 10, 1972, it filed a grievance against the County of Allegheny (hereinafter "County") under the pro-

visions of a collective bargaining agreement between the parties.[1] The grievance concerned two aspects of mealtime conditions for guards working at the Allegheny County jail: The Union demanded that the officers' lounge where the guards took their meals be supervised at mealtime by a guard and that the guards be able to select for their meals any food available from the jail kitchen rather than being limited to the menus offered to the prisoners. The matter proceeded to arbitration and, following a hearing in which the County entered only a "special" appearance, the arbitrator issued an award which agreed with appellant's position and sustained the grievance. On appeal, the Commonwealth Court, in a unanimous opinion, set aside the arbitrator's award. *County of Allegheny v. Allegheny Cty. Pris. Emp. I. U.,* 20 Pa.Cmwlth. 173, 341 A.2d 578 (1975).[2] This Court then granted the Union's petition for allowance of appeal.

The ultimate question before us is whether the arbitrator's interpretation of the collective bargaining agreement[3]

1. Appellant Union was first certified as the exclusive bargaining representative of a unit comprised of all the prison guards at the Allegheny County jail on May 29, 1971. The first collective bargaining agreement, under which the grievance was presented, was effective from May 1, 1972 to April 30, 1973. A successor agreement was in force from August 1, 1973 to April 30, 1976, and in all relevant respects its provisions were the same as those in the earlier agreement.

2. The County petitioned for an appeal both to the Court of Common Pleas of Allegheny County and to the Commonwealth Court. The Commonwealth Court accepted the appeal to it and vacated the appeal before the court of common pleas.

In *Community College of Beaver v. Community College of Beaver County, Society of the Faculty,* 473 Pa. 576, 375 A.2d 1267 (1977), this Court held that under Pa.R.J.A. 2101 an appeal from an arbitrator's award under a labor agreement negotiated under the Public Employee Relations Act of 1970 (PERA), Act of July 23, 1970, P.L. 563, No. 195, 43 P.S. § 1101.101 *et seq.* (Supp. 1977–78) was properly taken to the Commonwealth Court. Therefore, the Commonwealth Court's assertion of its exclusive jurisdiction in this case was correct. Pa.R.J.A. 2101 has been superseded by Pa.R.A.P. 703 and Pa.R.C.P. 247.

3. As in *Community College of Beaver, supra,* the relationship of the parties in this case is governed by the Public Employee Relations Act of 1970, Act of July 23, 1970, P.L. 563, No. 195, Art. I, § 101 *et seq.,* 43 P.S. § 1101.101 *et seq.* (Supp. 1977–78).

" 'can in any rational way be derived from the agreement, viewed in the light of its language, context, and any other indicia of the parties' intention . . . .' " [4] Because we conclude that the negative answer which the Commonwealth Court gave to this question was correct, we affirm its order setting aside the award.

## I.

The threshold question in this case is whether the subject matter of the asserted grievance was arbitrable. As this Court noted in *Board of Education of Philadelphia v. Federation of Teachers Local No. 3*, 464 Pa. 92, 99, 346 A.2d 35, 39 (1975),[5] Pennsylvania labor policy not only favors but requires the submission to arbitration of public employee grievances "arising out of the interpretation of the provisions of a collective bargaining agreement".[6] See also *Lincoln System of Education v. Lincoln Association of University Professors*, 467 Pa. 112, 354 A.2d 576 (1976). From this policy is derived the corollary principle that where, as here, an arbitrator has interpreted a collective bargaining agree-

4. *Community College of Beaver, supra* n.2, 473 Pa. at 593, 375 A.2d at 1275, quoting *Ludwig Honold Mfg. Co. v. Fletcher*, 405 F.2d 1123, 1128 (3d Cir. 1969). The paragraph in our *Community College* opinion in which the *Ludwig Honold* quotation appears is as follows:

"To state the matter more precisely, where a task of an arbitrator, PERA or otherwise, has been to determine the intention of the contracting parties as evidenced by their collective bargaining agreement and the circumstances surrounding its execution, then the arbitrator's award is based on a resolution of a question of fact and is to be respected by the judiciary if 'the interpretation can in any rational way be derived from the agreement, viewed in light of its language, its context, and any other indicia of the parties' intention . . . .' "

5. The present writer dissented in *Board of Education of Philadelphia, supra*, but on grounds not related to the proposition here referred to. 464 Pa. at 108, 346 A.2d 35.

6. Act of July 23, 1970, P.L. 563, No. 195, art. IX, § 903, 43 P.S. § 1101.903 (Supp. 1977–78) provides in part that

"Arbitration of disputes or grievances arising out of the interpretation of the provisions of a collective bargaining agreement is mandatory."

ment in favor of the arbitrability of the grievance before him, a reviewing court should be slow indeed to disagree.[7] As the Supreme Court of the United States observed in *United Steelworkers of America v. Warrior & Gulf Navigation Company*, 363 U.S. 574, 584–85, 80 S.Ct. 1347, 1354, 4 L.Ed.2d 1409 (1960):

> "In the absence of any *express* provision excluding a particular grievance from arbitration, we think only the most forceful evidence of a purpose to exclude the claim from arbitration can prevail, particularly where, as here, the exclusion clause is vague and the arbitration clause quite broad." (Emphasis added).

After reviewing the applicable clauses of the collective bargaining agreement in question[8] we cannot say that the arbitrator was in error when he concluded that the dispute concerning the mealtime conditions of the employee guards arose out of the interpretation or application of the provisions of the agreement. We must, therefore, disagree with

7. The interpretation of clauses of a collective bargaining agreement which delineate those matters to be submitted to arbitration involves, of course, a factual determination of the parties' intentions. See, *Community College of Beaver, supra,* 473 Pa. at 593, 375 A.2d at 1275.

8. The pertinent clauses are as follows:
"Article III—Grievance Procedure
1. Grievance Procedure Definitions:
A. Grievance—An alleged breach or violation of this Agreement or a dispute arising out of the interpretation or application of the provisions of this Agreement . . . .
2. Scope of Grievance Procedure:
A. Any matter not specifically defined as a grievance in Section 1 above, as well as any matter reserved to the discretion of the County by the statutes, legal precedents and regulations of the Commonwealth of Pennsylvania, and/or by the terms of this Agreement is not a grievance and will not be construed as a grievance . . . .
\* \* \* \* \* \*
"Article XII—Management Rights
The County retains and reserves unto itself all powers, rights, authority, duties and responsibilities including but not limited to the security of the prison conferred upon and vested in it by the Commonwealth of Pennsylvania and all matters not covered by this Agreement . . . ."

the Commonwealth Court insofar as it held that the grievance filed by the Union was not arbitrable.

## II.

■ Turning to the substantive question of whether the arbitrator's award had a rational basis in the collective bargaining agreement, we must conclude that it did not. The agreement contains no provision whatever which deals either with the question of security arrangements for the employees' mealtimes or with what food should be available to the employees from the prison kitchen.[9]

The arbitrator's decision that the union members were entitled to choose for their luncheons any food available in the prison kitchen and were not limited to the items available on the daily prison menu was based on what he found to have been the past practice of the parties over a period of time, a practice which, so the arbitrator held, had been implicitly incorporated in the collective bargaining agreement which became effective in 1972.[10]

9. The only clause of the agreement which refers to meals is found in Article VII, Section 4:
    "A lunch period of 30 minutes shall be made available to all employees before their sixth hour of work. . . ."
The Union argued to the arbitrator that implicit in this clause are both a choice of foods to be served to the guards and a requirement that security be provided during mealtimes. The arbitrator did not address himself to this contention in his opinion and award, nor did he in his award purport to interpret either the 30 minute lunch clause or the integration clause, (Article XXIV, Sec. 1), discussed *infra*. The dissenting opinion of Mr. Justice ROBERTS, *post*, has ascribed to the arbitrator interpretations that simply are not to be found in his decision.

10. The facts shown by the record are as follows:
    Before 1967, prison guards at the Allegheny County jail ate their meals in the prison kitchen, either bringing their lunches from outside or choosing from any of the food available within the prison. In May of 1967, the warden directed employees to cease bringing their own lunches. The Union protested this directive and submitted a grievance to a three member panel authorized by the predecessor statute to PERA, the Act of June 30, 1947, P.L. 1183, § 1 *et seq.*, 43 P.S. § 215.1 *et seq. as amended* (1964). This panel recommended that the prohibition against lunches brought from outside be continued, but that the guards be given a choice of any food available in the prison kitchen. For some time this recommendation, although not

A recognized commentator [11] in the field of labor law identifies four situations in which evidence of past practice [12] is used in arbitrations: (1) to clarify ambiguous language; (2) to implement contract language which sets forth only a general rule; (3) to modify or amend apparently unambiguous language which has arguably been waived by the parties; and (4) to create or prove a separate, enforceable condition of employment which cannot be derived from the express language of the agreement. In the case at bar, the arbitrator concluded that the implementation by the County

legally binding, was followed. When later an officer's lounge was established the guards were permitted to take their luncheons from the kitchen to the lounge to be eaten. In December, 1970, the warden issued an order, which although objected to was apparently complied with, restricting the prison guard personnel to a choice of food from the daily prison menu. After the collective bargaining agreement became effective in May of 1972, the Union filed the present grievance challenging the 1970 directive of management. When, apparently in response to the filing of this grievance, the prison authorities issued further orders restricting the guards' privileges, the Union filed an unfair labor practice charge with the Pennsylvania Labor Relations Board. This charge was settled by the County's agreement to rescind the later restrictions, with the understanding that the processing of the grievance would continue. After this settlement, the old practice of allowing each employee to select any food available was, according to the arbitrator, gradually reinstated.

11. R. Mittenthal, *Past Practice and the Administration of Collective Bargaining Agreements,* Proceedings of the 14th Annual Meeting of the National Academy of Arbitrators 30 (1961).

12. In a frequently cited passage in an arbitration award, the meaning of "past practice" has been stated as follows:

"A custom or practice is not something which arises simply because a given course of conduct has been pursued by Management or the employees on one or more occasions. A custom or a practice is a usage evolved by men as a normal reaction to a recurring type situation. It must be shown to be the *accepted* course of conduct characteristically repeated in response to the given set of underlying circumstances. This is not to say that the course of conduct must be *accepted* in the sense of both parties having agreed to it, but rather that it must be *accepted* in the sense of being regarded by the men involved as the *normal* and *proper* response to the underlying circumstances presented." Sylvester Garrett, Chairman, Board of Arbitration, U. S. Steel—Steelworkers, Grievance No. NL–453, Docket No. N–146, January 31, 1953. Reported at 2 *Steelworkers Arbitration Bulletin* 1187. (Emphasis in original.)

of the advisory recommendation of a panel of arbitrators in 1967[13] created a binding past practice, a clear example of the fourth use of past practices in the above formulation. With this implementation, the arbitrator held,

" . . . the Guards acquired a working condition which constituted a recognizable benefit. Its constant, continual use caused the benefit to ripen into a binding practice. . . . The privilege given to each Guard to choose his meal from the available kitchen foods became one of the many day-to-day facets of the working relationship between the Prison administration and its Guards. . . " Record at 13a.[14]

13. See n.10, *supra*.

14. The arbitrator gave the following rationale in support of his conclusion that the past practice was implicitly included in the bargaining agreement:

"The Warden was, or should have been, aware that a contractual grievance procedure provided the only practicable way by which the Union could attack his December 1970 edict [restricting the employes to food on the daily menu]. . . . During the negotiations leading up to the 1972 collective bargaining agreement, which first provided that type of grievance procedure, this awareness must be imputed to the County. It would obviously be impossible, in such an agreement, to incorporate all of the work practices and customs previously accepted by the mutual consent of the parties. If the County wished to bar this particular matter from the grievance procedure, the County had the duty to seek specific contract language on the subject. In this particular instance, the absence of a past practice clause does not eliminate the eating customs in effect as of December 1970 nor prevent the Union from setting aside the Warden's directive by filing a grievance. It is fair to conclude that the working condition at issue was one of the many implicitly incorporated into the collective bargaining agreement." Record at 13–14a.

In contrast, the Commonwealth Court, in an alternative ground for its decision, concluded as follows from its review of the record:

"If there did, in fact, exist a past policy regarding luncheon procedure, it was a policy of constant change. Being aware of the ever-varying nature of appellant's practice towards guards' luncheons, to escape the application of . . . [those provisions of the agreement dealing with management's discretion over all matters not covered by the agreement], it was incumbent upon . . . [the Union] to have negotiated and explicitly reached an agreement upon this particular condition of employment." 20 Pa.Cmwlth. at 178, 341 A.2d at 580.

As for the Union demand for protection of its members by a guard posted in the officers' lounge at mealtimes, the arbitrator concluded that a "slightly different" problem was involved but that the contractual reservation to the County in Article XII of all responsibility relating to security, see n.8, *supra,*

"must be interpreted in a reasonable fashion. The Union is not seeking to interfere with the security of the Prison. On the contrary, it is trying to insure the physical safety of its member Guards. . . . The Prison was sufficiently concerned about the problem to provide a Guard over the residents when employees ate in the Prison kitchen. There is no reason why the same protection ought not to be afforded to employees while they are eating in the Officers' Lounge." Record at 15a.

The question for decision is whether the arbitrator was correct in concluding that the parties to the contract here involved implicitly incorporated into it, as separately enforceable conditions of their employment relationship, practices relative to food and security at lunch times which had prevailed for a time in the past, when those practices are neither repudiated in the agreement nor inconsistent with its terms, but when the contract includes a broad clause to the effect that the agreement as written is the complete agreement between the parties.[15] Although the non-inclu-

In light of our disposition of this case there is no need for us to resolve the question of which, if either, party had the responsibility to take the initiative in making past practices a subject of negotiation. Similarly, we are not called upon to decide whether a practice which was legally but unilaterally terminated by employer direction a year and a half before the collective bargaining agreement was entered into, but which termination has been a subject of continuing controversy between the parties, is properly to be considered a "past practice" as a matter of law. *See* Mittenthal, *Past Practice and the Administration of Collective Bargaining Agreements,* 59 Mich.L.Rev. 1017, 1033–34 (1961).

**15.** The clause is contained in Article XXIV of the agreement and is as follows:

Article XXIV

"1. The parties mutually agree that the terms and conditions expressly set forth in this Agreement represent the full and complete agreement and commitment between the parties thereto."

sion of the practices in the bargaining agreement does not necessarily compel the conclusion that past practices are not impliedly so incorporated,[16] the existence in a contract of a broad integration clause, if it means anything, does clearly negate the notion that the parties meant to include any terms or conditions, including those based *only* on past practices, not specifically incorporated in the written contract or reasonably inferable from its provisions. We think that this provision is dispositive of this case.[17] At least one arbitrator has expressly so held, *Lone Star Brewing Co.*, 53

Paragraph 2 of Article XXIV provides as follows:
"2. All items proposed by the Union, whether agreed to or rejected, will not be subject to renegotiation until negotiations for a new contract commence . . . and items included within the scope of the bargaining which were or are not proposed by the Union shall likewise not be subject to negotiation until the period specified above . . . ."

16. Wallen, *The Silent Contract v. Express Provisions: The Arbitration of Local Working Conditions*, Proceedings of the Fifth Annual Meeting of the National Academy of Arbitrators 117 (1962).

As Mittenthal pointed out in his authoritative paper, *supra* n.11, at 47

"Most agreements . . . say nothing about management having to maintain existing conditions. They ordinarily do not even mention the subject of past practice. The question then is whether, apart from any basis in the agreement, an established practice can nevertheless be considered a binding condition of employment. The answer, I think, depends upon one's conception of the collective bargaining agreement. . . . '[I]s the agreement an exclusive' statement of rights and privileges or does it subsume continuation of existing conditions.' " (Footnote omitted.)

See also, Gilman, *Past Practice in the Administration of Collective Bargaining Agreements in Arbitration*, 4 Suffolk U.L.Rev. 689 (1970). *Note* "Labor Law—Arbitration and Award—Judicial Review of Labor Arbitration Awards which rely on the Practices of the Parties," 65 Mich.L.Rev. 1647 (1967). See in general Griffin, *Judicial Review of Labor Arbitration Awards*, 4 Suffolk U.L.Rev. 39 (1969); Markham, *Judicial Review of an Arbitrator's Award under Section 301(a) of the Labor Management Relations Act*, 39 Tenn.L.Rev. 613 (1972).

17. The arbitrator made note of the existence of Article XXIV, only to conclude, without explanation, that its "zipper provisions" were inapplicable. Record at 13a. It does not advance a reasoned solution of the problem presented by this case to dismiss this provision as "boilerplate," the characterization used in both dissenting opinions, *infra*. We are obliged to take the agreement as the parties wrote it. The significance of the integration clause is given emphasis

LA 1317 (1969) (LeRoy Autrey), and we know of no decision to the contrary. See also Cox & Dunlop, *The Duty to Bargain Collectively During the Term of an Existing Agreement*, 63 Harv.L.Rev. 1097, 1116–1117 (1950).

█ In deciding as we do, we hold only that where a collective bargaining agreement not only makes no mention whatever of past practices but does include a broad integration clause, an award which incorporates into the agreement, as separately enforceable conditions of the employment relationship, past practices which antedate the effective date of that agreement cannot be said to "draw its essence from the collective bargaining" agreement.[18] *United Steelworkers v. Enterprise Wheel and Car Corp.*, 363 U.S. 593, 596, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960). We hasten to add that courts are not to become super-arbitrators and are bound to defer to the arbitrators' findings relative to the intent of the parties as the arbitrators perform their task of interpreting labor contracts negotiated under PERA. See *Community College of Beaver County v. Community College of Beaver County, Society of the Faculty*, 473 Pa. 576, 375 A.2d 1267 (1977). The able arbitrator in this case, however, was not so much interpreting the contract before him as he was declaring, no doubt out of his conviction of what was fair and reasonable, that the employer should be bound by a non-existent provision which the arbitrator then incorporates into the contract by implication. But there is here nothing to support the implication. Conceding that the past attitude of the management of the County's prison may have been

by the broad language of the management rights clause (Article XII) quoted at n.8, *supra*.

**18.** Mittenthal, *supra* note 11, at 48–49, articulates the theory on which many arbitrators rely in concluding that a past practice not specifically repudiated during negotiations for a contract are impliedly incorporated in the agreement which is finally reached. He then observes (p. 49, n.39):

"This implication, of course, would not be possible if it conflicted with the express language of the contract. For example, if a contract said the written provisions constitute the entire agreement of the parties, it would be difficult to imply that the parties meant to make practices a part of their contract."

petty, it is nevertheless a function of future bargaining to remedy the situation. For the arbitrator to seek to supply the remedy is on these facts not in accord with the approach of *Enterprise, supra,* which we have adopted as the proper one for applying the Arbitration Act in public employment contracts. The award must, therefore, be set aside. *See* Sec. 11(d) of the Act of April 25, 1927, P.L. 381, No. 248, 5 P.S. § 171(d); *Community College of Beaver County, supra.*

What we have said, of course, is not to suggest that in another case the evidence may not justify a contrary conclusion. Nor do we intend to say that an arbitrator's reliance on past practices to clarify ambiguous language in the collective bargaining agreement, to implement general contract language or to show that a specific provision in the contract has been waived by the parties, would be improper although the agreement in question included an integration clause.[19]

The order of the Commonwealth Court is affirmed.

NIX, J., did not participate in the consideration or decision of this case.

JONES, Former C. J., did not participate in the decision of this case.

ROBERTS, J., filed a dissenting opinion.

MANDERINO, J., filed a dissenting opinion.

ROBERTS, Justice, dissenting.

Appellant, Allegheny County Prison Employees Independent Union, negotiated a collective bargaining agreement with appellee, Allegheny County, covering the salaries and working conditions of guards at the Allegheny County Jail. In 1972, appellant filed a grievance against appellee concern-

19. Gilman makes the point that much of the confusion related to prior courses of conduct in the context of collective bargaining agreements could be eliminated by carefully drafted provisions and by an increased awareness on the part of negotiators of the possible implications of such past practices. *See* Gilman, *supra,* 4 Suffolk U.L.Rev. at 704.

ing the food available to guards at mealtimes and security provisions in the dining hall during guards' meals. The arbitrator sustained the grievance and granted the award requested by the Union. On appeal, the Commonwealth Court held that the grievance was not arbitrable because it does not "arise out of" the collective bargaining agreement. The Union petitioned for allocatur, which we granted. The majority now affirms the judgment of the Commonwealth Court, holding that although the grievance was arbitrable, the arbitrator's award did not have a "rational basis in the collective bargaining agreement."

I agree with the majority's conclusion that the grievance is arbitrable. I disagree, however, with the majority's conclusion that the arbitrator's award exceeded the bounds of the collective bargaining agreement.

The majority reaches its result because it asserts that the arbitrator drew upon "past practices" in making his award, and that consideration of such practices is barred by an integration clause in the collective bargaining agreement. In so holding, however, the majority substitutes its interpretation of the integration clause for that of the arbitrator, in contravention of the contractual arbitration clause which gives the arbitrator power to interpret all parts of the collective bargaining agreement including the integration clause itself. The majority also contravenes the decisions which make the arbitrator the final interpreter of the contract both as to law and to fact. See *Community College of Beaver v. Community College of Beaver County, Society of the Faculty*, 473 Pa. 576, 375 A.2d 1267 (1977); *Sudders v. United National Insurance Co.*, 217 Pa.Super. 196, 269 A.2d 370 (1970), aff'd, 445 Pa. 599, 284 A.2d 500 (1971), following *Ludwig-Honold Mfg. Co. v. Fletcher*, 405 F.2d 1123, 1128 (3d Cir. 1969); *United Steelworkers v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960).

The majority's holding deprives the arbitrator of two of his most valuable tools in settling labor disputes whenever the collective bargaining agreement contains a boilerplate integration clause. These tools are the arbitrator's knowl-

edge of the particular conditions in which labor and management operate and his knowledge of the rules—the "law of the shop"—which labor and management have developed to respond to these conditions. I cannot agree that the presence of an integration clause so completely alters the basic rules of the arbitration process. I therefore dissent.

The majority holds that the arbitrator failed to give proper weight to the "integration clause" in the collective bargaining agreement. In so doing, however, the majority misapplies the "essence test," the standard by which courts of this Commonwealth are to review arbitration awards. See *Community College of Beaver v. Community College of Beaver County, Society of the Faculty*, 473 Pa. 576, 375 A.2d 1267 (1977). The essence test adopted in *Community College of Beaver County*, supra, was first set forth by the Supreme Court of the United States in *United Steelworkers v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 596–97, 80 S.Ct. 1358, 1360–61 (1960):

"The refusal of courts to review the merits of an arbitration award is the proper approach to arbitration under collective bargaining agreements. The . . . policy of settling labor disputes by arbitration would be undermined if courts had the final say on the merits of the awards. . . . [T]he arbitrators under these collective agreements are indispensable agencies in a continuous collective bargaining process. They sit to settle disputes at the plant level—disputes that require for their solution knowledge of the custom and practices of a particular factory or of a particular industry as reflected in particular agreements.

When an arbitrator is commissioned to interpret and apply the collective bargaining agreement, he is to bring his informed judgment to bear in order to reach a fair solution of a problem. This is especially true when it comes to formulating remedies. There the need is for flexibility in meeting a wide variety of situations. The draftsmen may never have thought of what specific remedy should be awarded to meet a particular contingency. Nevertheless,

an arbitrator is confined to interpretation and application
of the collective bargaining agreement; he does not sit to
dispense his own brand of industrial justice. He may of
course look for guidance from many sources, yet his award
is legitimate *only so long as it draws its essence from the
collective bargaining agreement.* When the arbitrator's
words manifest an infidelity to this obligation, courts have
no choice but to refuse enforcement of the award."
This "essence test" reflects a judgment that arbitrators, and
not courts, are best equipped to deal with the multitude of
potential disputes which the parties agree to submit to them.
This deferential standard also serves to solidify the integrity
of the arbitration process by giving the parties the assurance
that the decision of the arbitrator will, in the vast majority
of cases, be final.

The majority's decision is contrary to these policies. The
majority, by requiring the arbitrator to conform to the strict
rules of contract law applied by the courts in non-labor
contract cases deprives him of the opportunity to employ his
knowledge of the customs and practices of the industry and
the shop involved. As the Supreme Court of the United
States stated in *United Steelworkers v. Warrior & Gulf
Navigation Co.*, 363 U.S. 574, 579–80, 582–83, 80 S.Ct. 1347,
1351, 1352 (1960):

"'the institutional characteristics and the governmental
nature of the collective-bargaining process demand a com-
mon law of the shop which implements and furnishes the
context of the agreement. We must assume that intelli-
gent negotiators acknowledged so plain a need unless they
stated a contrary rule in plain words.'

. . . . .

The labor arbitrator's source of law is not confined to the
express provisions of the contract, as the industrial com-
mon law,—the practices of the industry and the shop—is
equally a part of the collective bargaining agreement
although not expressed in it. The labor arbitrator is
usually chosen because of the parties' confidence in his
knowledge of the common law of the shop and their trust

in his personal judgment to bring to bear considerations which are not expressed in the contract as criteria for judgment."

In view of the fact that the guards are required to eat their meals on the premises, the award here which covers the meals for guards and the security available to the guards while eating involves important working conditions. By allowing a boilerplate integration clause to divest the arbitrator of the ability to make an award concerning these important conditions, the majority defeats the policy which encourages arbitrators to draw upon their knowledge of the particular job setting so that a "fair solution of the problem" can be reached. The majority forces the arbitrator to treat the integration clause with more deference than the parties to the collective bargaining agreement may have intended, given their particular work situation. In so holding, the majority discourages the arbitrator from performing fully the services expected from him.

Moreover today's decision destroys the stability of the arbitration process. "[T]he arbitrators are the final judges of both law and fact and their award will not be disturbed for a mistake of either." *Ludwig-Honold Mfg. Co. v. Fletcher*, 405 F.2d 1123, 1128 (3d Cir. 1969). Accord, *Sudders v. United National Insurance Co.*, 217 Pa.Super. 196, 269 A.2d 370 (1970), aff'd, 445 Pa. 599, 284 A.2d 500 (1971). If an award of an arbitrator is upheld by the courts so long as it is rationally based, then parties can respect the decision of the arbitrator as a final resolution of the dispute between them. If, instead, the award of the arbitrator is open to unnecessary judicial modification, the arbitrator becomes only a small step in the process of resolving labor disputes; the judgment of the arbitrator which the parties bargained for is thereby replaced with the judgment of the courts.[1]

1. The majority decision today, injecting the courts into an area properly reserved for the arbitrator, is bound to produce unnecessary additional burdens upon the judicial system. If courts will be required to assume the function of the arbitrator, the advantages of arbitration as a speedy, fair, inexpensive substitute for court litigation will be largely dissipated.

It is part of the arbitrator's function, not part of a court's, to determine the import of an integration clause in a collective bargaining agreement, at least where the contract contains a clause submitting to arbitration any "dispute arising out of the interpretation or application. of the provisions of this Agreement." We must realize that an arbitrator may draw his understanding of any clause in the contract, including an integration clause, from the particular labor setting in which the contract was signed. See, e. g., *Warrior & Gulf Navigation Co.,* supra; *Enterprise Wheel & Car Corp.,* supra; *Ludwig-Honold Mfg. Co.,* supra. Here, the arbitrator specifically found that the parties could not have reduced to writing all aspects of the ongoing labor-management relationship. In fact, the "lunch period" clause does not specifically mention all the conditions under which employees are to take their meal breaks. The arbitrator concluded that the contract should be interpreted so that the conditions under which the lunch break is taken are appropriate to the workplace in which these employees find themselves. These employees are prison guards. They are prohibited from leaving prison grounds during lunch. It was wholly rational for the arbitrator to use his knowledge of what work in a prison is like to conclude that when the contract specified a "30-minute lunch period" it must have meant a lunch period during which there is adequate protection for those guards who are eating. Similarly, it is not so irrational as to go beyond the essence of the agreement for the arbitrator to conclude that a "30-minute lunch period" was intended to be a period at which the guards, like most American workers, have a reasonable choice of foods. The arbitrator was aware of the impracticality of allowing the guards to enter and leave the prison grounds during lunch in order to find a choice of foods. He also considered the prison rule prohibiting guards from bringing their own lunches. He devised means of implementing the collective bargaining agreement based on the peculiar circumstances of these particular workers in this particular prison. This is the arbitrator's job.

The arbitrator reached these conclusions in light of the arbitration and integration clauses in the contract. It was his duty under the arbitration clause to interpret the "lunch" clause. He interpreted it in light of management rules and working conditions which require prison employees to remain on the premises and to eat food from the prison kitchen. In the course of interpreting the "lunch" provision of the contract, he found the integration clause did not preclude his award.[2]

We see from these circumstances that the arbitrator drew his conclusions from, and based his award upon, the essence of the contract. We are not free to say that whenever the arbitrator interprets a contract differently from the manner in which a court might have interpreted it, the arbitrator has stepped outside the essence of the contract. *Ludwig-Honold Mfg. Co. v. Fletcher*, supra; *Sudders v. United National Insurance Corp.*, supra; see *United Steelworkers v. Enterprise Wheel & Car Corp.*, supra. Here the Commonwealth Court disagreed with the interpretation the arbitrator placed upon the collective bargaining agreement between the parties. The parties did not bargain for the judgment of the court, however. They expressed a preference for the judgment of an arbitrator. This is why the award of an arbitrator will be sustained if there is "any rational way" it can be "derived from the [collective bargaining] agreement, viewed in the light of its language, context, and any other indicia of the parties' intention

---

**2.** In footnote 17, the majority opinion states that the arbitrator here did not give a "reasoned" explanation for his interpretation of the integration clause. I find that the opinion of the arbitrator does disclose the train of thought by which he reached his conclusion. But even if the opinion is unclear or ambiguous, we should remember that

"A mere ambiguity in the opinion accompanying an [arbitral] award, which permits the inference that the arbitrator may have exceeded his authority, is not a reason for refusing to enforce the award. Arbitrators have no obligation to give their reasons for an award. To require opinions free of ambiguity may lead arbitrators to play it safe by writing no supporting opinions."

*United Steelworkers v. Enterprise Wheel & Car Corp.*, 363 U.S. at 598, 80 S.Ct. at 1361.

. . . ." *Community College of Beaver v. Community College of Beaver County, Society of the Faculty,* 473 Pa. 576, 375 A.2d 1267 (1977), quoting *Ludwig-Honold Mfg. Co. v. Fletcher,* supra.

I would reverse the order of the Commonwealth Court and enforce the award of the arbitrator.

MANDERINO, Justice, dissenting.

I agree with the majority that we should uphold the arbitrator's decision that this grievance filed by the Union was arbitrable. I cannot agree, however, that because this particular collective bargaining agreement contains an integration clause, the arbitrator was in error in determining that a past practice, though not specifically mentioned in the collective bargaining agreement, was implicitly incorporated in that agreement.

A collective bargaining agreement cannot possibly cover every single term and condition of employment. The existence of an integration clause does not alter this fact. Integration clauses such as the one which existed here are boilerplate, and parties to a collective bargaining agreement do not, because an integration clause is present, go to any greater lengths to insure that every term or condition of employment, form the choice of meals to the furnishing of restroom necessities, is contained within the agreement. Under the majority's reasoning, if the employer has been furnishing toilets and toilet paper but the agreement is silent about such matters, the employer can ignore the past practice and cease furnishing the restroom necessities.

Here, the arbitrator concluded that the parties *agreed* on certain conditions concerning guards' lunches, conditions which were present prior to the effective date of the agreement and which the parties felt no need to spell out in the collective bargaining agreement. That conclusion should be upheld in spite of the existence of a "broad" integration clause, otherwise, collective bargaining agreements will have to be written on rolls of paper stretching endlessly. The parties bargained for an arbitrator to interpret their con-

tract and they are bound by his award. As the United States Supreme Court observed:

"[T]he question of interpretation of the collective bargaining agreement is a question for the arbitrator. It is the arbitrator's construction which was bargained for; and so far as the arbitrator's decision concerns construction of the contract, the courts have no business overruling him because their interpretation of the contract is different from his." *United Steelworkers of America v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 599, 80 S.Ct. 1358, 1362, 4 L.Ed.2d 1424, 1429 (1960).

When parties to a collective bargaining agreement agree to have an arbitrator interpret their contract, we should keep in mind that the "arbitrator's source of law is not confined to the express provisions of the contract," rather, "the practices of the industry and the shop—is equally a part of the collective bargaining agreement although not expressed in it." *United Steelworkers of America v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 581–82, 80 S.Ct. 1347, 1352, 4 L.Ed.2d 1409, 1417 (1960).

I respectfully dissent.