**COMMONWEALTH of Pennsylvania, DEPARTMENT OF GENERAL SERVICES, Petitioner**

v.

**FRATERNAL ORDER OF POLICE, LODGE 85, Respondent.**

Commonwealth Court of Pennsylvania.

Argued May 10, 2006.

Decided July 19, 2006.

Patricia J. Goldband, Sr. Counsel, Harrisburg, for petitioner.

Sean T. Welby, Harrisburg, for respondent.

BEFORE: McGINLEY, Judge, SMITH–RIBNER, Judge, PELLEGRINI, Judge, FRIEDMAN, Judge, LEADBETTER, Judge, COHN JUBELIRER, Judge, and LEAVITT, Judge.

OPINION BY Judge FRIEDMAN.

Commonwealth of Pennsylvania, Department of General Services (DGS) petitions for review of the May 28, 2005, arbitration award directing DGS to cease and desist assigning certain work to non-bargaining-unit employees. We affirm.

The Capitol Police Bureau, which is part of DGS, is responsible for police and security work in the Capitol Complex. This work is performed by two classes of employees: (1) security officers, who are unarmed and have no police powers; and (2) police officers, who are armed and do have police powers. According to class specifications prepared by the Office of Administration, security officers perform routine or introductory police work. They are responsible for patrolling assigned areas of the state capitol and protecting and guarding people and property from fire, theft, trespass and other hazards. The duties of the security officers may involve regulating the activities of the general public and may include performing limited police duties. The work of the security officers is performed in accordance with prescribed rules and procedures. (R.R. at 111a.)

Employees classified as police officers perform general duty police work; they are sworn police officers with the power of arrest. They enforce Commonwealth rules, regulations and laws, including the Crimes Code and the Motor Vehicle Code. The police officers' duties include: conducting patrols; directing traffic, issuing tickets and investigating accidents; investigating crimes and suspected crimes; investigating missing persons reports; observing and inspecting crime scenes; assisting visitors and Commonwealth employees; and responding to calls for assistance in medical, fire and criminal incidents. (R.R. at 113a.) For collective bargaining purposes, the police officers are represented by the Fraternal Order of Police, Lodge 85(FOP).

As the class specifications demonstrate, some of the duties of the security officers and police officers overlap. The collective bargaining agreement (CBA) between the

FOP and the Commonwealth also reflects that fact. Specifically, Article 44, Section 2, of the CBA provides as follows:

Effective July 1, 2000, any and all new posts or assignments which could be staffed by Capitol Police or Commonwealth of Pennsylvania Capitol Security Officers shall not be staffed in a manner that would reduce the current complement of Capitol Police Officers.

(R.R. at 42a.)

Following the events of September 11, 2001, DGS implemented new security procedures in the Capitol Complex. In September 2002, five new security scanning posts were created at entrances in the Main Capitol, the East Wing of the Capitol, the Ryan Annex and the North and South Office Buildings.[1] Walk-through metal detectors and x-ray machines were installed at each of these posts. Work at these new posts was offered to police officers and security officers, (R.R. at 116a), and both police officers and security officers were assigned the responsibility of ensuring that, prior to entering the buildings, every visitor passes through the metal detectors and submits his or her personal belongings for inspection through the x-ray machine.

Procedures for the scanning detail are set forth in the Capitol Police Duty Manual and were distributed to all personnel. Duties at the new posts include: inspecting the equipment; checking that doors are locked; monitoring the x-ray machine monitor and walk-thru scanner; hand scanning any person that activates the detector; and issuing visitor passes. The procedures set forth staffing guidelines for each post and state that at least one armed officer shall be assigned to each post. (R.R. at 101a–10a.) The manner in which the new posts were staffed has not reduced the complement of Capitol Police Officers; in fact, as of September 27, 2002, the number of police officers had increased. (R.R. at 50a.)

On September 23, 2002, the FOP filed a grievance, alleging violations of Article 1, Article 42 and Article 44 of the CBA.[2] Specifically, the grievance alleged that police and security functions within the Capitol Complex were performed exclusively by members of the FOP bargaining unit prior to September 9, 2002, and that the Commonwealth violated the CBA when it unilaterally assigned non-bargaining-unit personnel to perform detention search and seizure duties. (R.R. at 44a.) The grievance ultimately proceeded to arbitration, and a hearing was held before the arbitrator on March 10, 2005.[3]

The FOP asserted that the work performed at the new posts is, in fact, search work, akin to "Terry searches"[4] previously and exclusively performed by police officers. DGS does not dispute that the police officers exclusively performed such searches and, if a security officer believed a search of this type was warranted, the security officer called upon a police officer to complete the task. The FOP argued that the only differences between the

---

1. The South Office Building has since been renamed the K. Leroy Irvis Building.

2. In pertinent part, Article 1 recognizes the FOP as the exclusive representative for collective bargaining purposes for the police officers. Article 42 sets forth job security provisions in the event that the Commonwealth sells, leases, transfers or assigns any of its facilities.

3. No record or transcript of the hearing was filed with this court.

4. The description refers to *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), in which the United States Supreme Court set forth the standards for "reasonable suspicion" searches.

searches historically performed by police officers and the work done at the scanning posts are that these functions are now carried out at centralized locations and the employees are using new technology; according to the FOP, the actual duties remain the same.

The Commonwealth asserted that it did not violate the CBA because the duties at the new posts are of the type that could be performed either by police officers or security officers. The Commonwealth maintained that the metal detector and x-ray duties do not require the exercise of police powers. Rather, the security officers at the new posts merely watch visitors and their belongings pass through machines; they do not conduct non-consensual searches or involuntarily detain visitors. The Commonwealth argues that the language in Article 44 gives it the right and the flexibility to make assignments utilizing police officers and security officers, and, because the complement of police officers has not been reduced, there has been no violation of the CBA.

Following the hearing, the arbitrator concluded that:

Searches were previously performed by police officers in the form of "Terry searches." The Commonwealth witness did not refute the fact [that] the police officers were historically the exclusive agent to perform searches. The record also reveals [that] if a security officer needed to conduct a search, the security officer called upon the police officer because this class of employee had the power to complete the search task. In my opinion, although the manner of search has changed from the typical "Terry stop" to a more efficient style of search with a metal detector and x-ray machine, the basic function of the search remains the same. The police officer who performed the search in the past was required to pat down an individual to look for weapons or other prohibited items. It is my determination [that] the desired outcome of the metal detector/x-ray search is the same as the expected outcome of the Terry stop because the police officer is still charged with locating unauthorized weapons and prohibited items.... The metal detector and x-ray machine, in my opinion, were installed by the Commonwealth to more effectively carry out the search function. However, the new technology did not take away from the function the police officer is expected to achieve as a result of the searches. It is also my opinion [that] the operational duties of metal detector and x-ray machine should not have been assigned to the security officers with the implementation of the new technology, because the basic search duties which were exclusive to the police officer did not change. Consequently, since the search work required at the new posts could not be considered as new work, it should remain with the police officers unless bargaining produces a different result.

(R.R. at 12a–13a.) The arbitrator ordered DGS to return the work at the newly created posts to the police officers, and DGS now appeals to this court.

Our scope of review is limited to narrow certiorari, which allows inquiry into only: (1) the jurisdiction of the arbitrator; (2) the regularity of the proceedings; (3) whether the arbitrator exceeded his powers; or (4) whether there was a deprivation of constitutional rights. *Pennsylvania State Police v. Pennsylvania State Troopers Association*, 840 A.2d 1059 (Pa.Cmwlth.), *appeal denied*, 578 Pa. 711, 853 A.2d 363 (2004). The arbitrator exceeds his authority when he grants an award that addresses issues beyond the scope of the collective bargaining agree-

ment or extends beyond the terms and conditions of employment. *Township of Ridley v. Fraternal Order of Police Lodge No. 27*, 718 A.2d 872 (Pa.Cmwlth.1998), *appeal denied*, 563 Pa. 636, 758 A.2d 666 (1999).

■ An error of law is not sufficient to support a reversal of an arbitrator's award. *City of Pittsburgh v. Fraternal Order of Police Fort Pitt Lodge No. 1*, 764 A.2d 101 (Pa.Cmwlth.2000), *appeal denied*, 566 Pa. 650, 781 A.2d 148 (2001). In addition, an appellate court may not disregard an arbitrator's findings of fact or contract interpretation if the arbitrator is even arguably construing or applying the contract and acting within the scope of his authority. *Id.*

■ DGS argues that the arbitrator exceeded his authority by addressing issues beyond the scope of the CBA. DGS relies on Article 2, Section 1 of the CBA, which provides as follows:

> Except as modified by this Agreement, it is understood and agreed that the Employer, at its sound discretion, possesses the right, in accordance with applicable laws, to manage all operations including the direction of the working force and the right to plan, direct, and control the operation of all equipment and other property of the Employer.
>
> Matters of inherent managerial policy are reserved exclusively to the Employer. These include but shall be not be not limited to such areas of discretion or policy as the functions and programs of the Employer, standards of service, its

overall budget, utilization of technology, the organizational structure and selection and direction of personnel.

(R.R. at 37a.) DGS notes that Article 44, Section 2, of the CBA sets forth the criteria for manning new posts or assignments that could be staffed by either category of employee and provides only that such positions shall not be staffed in a manner that reduces the number of police officers. DGS argues that no language in Article 44 restricts the authority of DGS to assign work to security officers on the grounds that the work at issue previously had been performed by police officers. DGS maintains that, by inquiring whether the work had been performed historically by police officers, the arbitrator exceeded his jurisdiction, because the CBA states that the arbitrator shall not add to, subtract from or modify the provisions of the CBA.[5]

The FOP responds that the arbitrator properly considered the issue of whether the new assignments constitute work that was previously and exclusively performed by members of the bargaining unit. The FOP notes that the transfer of bargaining unit work repeatedly has been held to be a proper subject of collective bargaining as a "term and condition of employment," citing *City of Allentown v. Pennsylvania Labor Relations Board*, 851 A.2d 988 (Pa. Cmwlth.2004); *Borough of Geistown v. Pennsylvania Labor Relations Board*, 679 A.2d 1330 (Pa.Cmwlth.1996), *appeal denied*, 547 Pa. 759, 692 A.2d 568 (1997); and *City of Harrisburg v. Pennsylvania Labor Relations Board*, 146 Pa.Cmwlth. 242, 605 A.2d 440 (1992).[6] The FOP argues that, because the transfer of bargaining unit

---

5. According to DGS, the arbitrator should have limited his examination to the actual contract language and inquired only whether: (1) the scanning posts were new posts or assignments; (2) the work commenced on or about September 9, 2002; (3) the assignments staffed by the security officers did not require the exercise of police powers and thus could

be staffed by either category of employee; and (4) subsequent to the staffing of the new posts, the complement of police officers was reduced.

6. In its brief on appeal, the FOP notes that a unilateral transfer of bargaining unit work would ordinarily be considered by the Penn-

work is recognized as a term and condition of employment, the issue is not beyond the scope of the CBA.

The FOP further maintains that "bargaining unit work" is encompassed in the phrase "working conditions," referenced in Article 41, Section 5, of the CBA. That section states:

> Officer benefits and working conditions now existing and not in conflict with the Agreement shall remain in effect subject, however, to the right of the employer to change these benefits or working conditions in the exercise of its management rights reserved to it under Article 2 of this Agreement.

(R.R. at 41a.)

The FOP argues that, in deciding whether Article 44, Section 2, had been

violated, the arbitrator determined that the assignments at the new posts could not be staffed by either police officers or security officers because the work involved was bargaining unit work. According to the FOP, the arbitrator did not add any provisions to the CBA; instead, the arbitrator's determination is simply an interpretation of existing language in the CBA, as bargained for by the parties.

■ Regardless of whether we agree with the arbitrator's determination,[7] we are constrained by our extremely limited scope of review. *See Pennsylvania State Police v. Pennsylvania State Troopers Association,* 698 A.2d 688 (Pa.Cmwlth.1997), *aff'd,* 559 Pa. 586, 741 A.2d 1248 (1999) (affirming award that reinstated trooper

---

sylvania Labor Relations Board (PLRB) to be an unfair labor practice. However, according to the FOP, the PLRB has consistently directed the parties to resolve such matters through the grievance and arbitration procedures of the CBA where, as here, the CBA specifically addresses the issue of bargaining unit work. (FOP's brief at 7–8, n. 4.)

In addition, the PLRB will defer unfair labor practice charges to arbitration actions that have been filed and involve the same factual scenario. Before arbitration, the PLRB will defer a matter when (1) the grievance was filed before the unfair labor practice charge; (2) the charges are rooted in the labor contract between the parties; and (3) the conduct that is the source of both the grievance and the charge does not allege any discrimination toward the exercise of employee rights. After arbitration, the PLRB will defer to the decision of the arbitrator if (1) the grievance procedure was fair and regular; (2) the dispute was amicably settled or resolved by timely arbitration; and (3) the arbitrator's result was not repugnant to the policies of the Public Employe Relations Act, Act of July 23, 1970, P.L. 563, *as amended,* 43 P.S. §§ 1101.101–1101.2301. See *American Federation of State, County and Municipal Employees, Council 13, AFL–CIO v. Pennsylvania Labor Relations Board,* 108 Pa.Cmwlth. 482, 529 A.2d 1188 (1987).

7. We believe that there are *significant* distinctions between the "Terry" stop and frisk search as performed by police officers and the monitoring bags passing through an x-ray scanner. For example, a "Terry" stop and frisk is permissible under the Fourth Amendment only if the police officer has a justified belief that the individual is armed and presently dangerous to the police office or himself. *Terry; Commonwealth v. Todd,* 401 Pa.Super. 106, 584 A.2d 1002 (1991). The limited searches of persons seeking to enter sensitive facilities typically are viewed as administrative searches that, although also warrantless, are permissible under the Fourth Amendment if they are part of a general practice and are not for the purposes of securing evidence for criminal investigations. *See In Interest of F.B.,* 442 Pa.Super. 216, 658 A.2d 1378 (1995), *aff'd,* 555 Pa. 661, 726 A.2d 361 (1999), *cert. denied,* 528 U.S. 1060, 120 S.Ct. 613, 145 L.Ed.2d 508 (1999); *Commonwealth v. Vecchione,* 327 Pa.Super. 548, 476 A.2d 403 (1984). In some jurisdictions, a limited administrative search will be upheld as reasonable only where persons subject to the search have given implied consent. *See McMorris v. Alioto,* 567 F.2d 897 (9th Cir.1978) (holding that persons voluntarily consent to a limited search before entering the courthouse and are under no compulsion to submit).

who, after drinking heavily, pulled his service revolver and threatened to blow a woman's head off). Where, as here, resolution of an issue depends upon fact-finding and/or interpretation of the CBA, "we are bound by the arbitrator's determination of these matters even though we may find them to be incorrect." *Pennsylvania State Police v. Pennsylvania State Troopers Association*, 840 A.2d at 1062. In this case, the arbitrator's award "was based upon both contract interpretation and factual findings [concerning the nature of the search work], to which this court is bound to defer." *Id.* at 1063.

Accordingly, we affirm.

Judge PELLEGRINI concurs in the result only.

### ORDER

AND NOW, this 19th day of July, 2006, the arbitration award, dated May 28, 2005, is hereby affirmed.

### CONCURRING OPINION BY Judge LEADBETTER.

I concur in the result reached by the majority, and agree that it is in accordance with current law. It seems to me, however, that the unfair labor practice tail is wagging the unit clarification dog, and a toothless dog it is, which makes it impossible to insure a fair and orderly process to resolve disputes of this type. Where two (or more) different bargaining units each lay a claim to have its members fill new positions, fundamental fairness dictates that any order directing which Union will prevail should come from a proceeding in which all interested parties are represent-

ed.[1] This can only occur before the PLRB, since a grievance arbitration is necessarily limited to the employer and the single Union whose CBA is claimed to have been violated. Multiple arbitrations could lead to inconsistent results, *i.e.*, orders that each Union is entitled to the job, and appellate review is so circumscribed as to be powerless to rectify the incongruous result. Moreover, where, as here, each of two Unions has a viable claim that its members have historically performed work similar to the newly created jobs, it seems likely that employer will be found to have committed an unfair practice vis-à-vis whichever Union does not get the work.

A public employer does not have the right to decide unilaterally (at least without bargaining) which unit's members will be given the new assignment, but it ought to be entitled to have a forum which will consider all competing interests and decide the issue once and for all. There is no question that the PLRB has jurisdiction and the power to fill this role. It can determine whether one Union can legitimately claim entitlement to the new job and, if not, clarify the appropriate bargaining unit or, if so, issue a range of appropriate orders. Nonetheless, the PLRB takes the position that its unit clarification orders are not dispositive of the issue of who will get the jobs,[2] and routinely defers unfair labor practice claims to arbitration.

Although I can find no existing authority to support the view that it is mandated by law, were it up to me I would say that the PLRB has exclusive jurisdiction over such disputes, whether brought as unfair practice claims or as unit clarification petitions,

---

1. *Cf. State Sys. of Higher Educ. v. Pa. Labor Rel. Bd.*, 757 A.2d 442 (Pa.Cmwlth.2000) (PLRB consolidated two separate petitions for unit clarification that sought to include the same employees into their bargaining unit).

2. *See City of Wilkes–Barre v. Pa. Labor Rel. Bd.*, 32 Pa. Pub. Emp. R. ¶ 32,137 (final order 2001), *aff'd*, Pa.Cmwlth. No. 1776 C.D.2001 (filed April 10, 2002).

and that it must bring in all potentially interested parties and enter an order which disposes of the entire controversy.

Judge COHN JUBELIRER and Judge LEAVITT join in this concurring opinion.

CONCURRING OPINION BY Judge LEAVITT.

I join in the concurring opinion of Judge Leadbetter. I write separately because I do not agree with the majority opinion analysis for additional reasons. Specifically, unlike the majority, I do not believe the arbitrator's award bears any rational relation to the language of the collective bargaining agreement. Unfortunately, as this Court has previously observed, there is "not much" that can be done about an arbitrator's disregard of the CBA under the narrow certiorari standard of review. *Bensalem Township v. Police Benevolent Association*, 803 A.2d 239, 240 (Pa. Cmwlth.2002).

In September 2002, walk-through metal detectors and x-ray machines were installed in five different locations, two in the Capitol and three in adjacent government buildings, for the first time anywhere in the Capitol Complex. The Commonwealth assigned security officers the task of operating the x-ray machines and walk-through metal detectors. In addition, the Commonwealth assigned an armed capitol police officer to each location as back-up, in the event a threat to security should develop that required the exercise of police powers.[1] In response, Fraternal Order of Police, Lodge 85 (Union), which represents the capitol police, filed a grievance, claiming that the operation of these devices was work that could only be done by capitol police, not by security officers. The arbitrator found in favor of the Union, and the Commonwealth now seeks to have the award vacated.

Article 44, Section 2 of the CBA states as follows:

> Effective July 1, 2000, any and all new posts or assignments which could be staffed by Capitol Police or the Commonwealth of Pennsylvania Security Officers shall not be staffed in a manner that would reduce the current complement of Capitol Police Officers.

R.R. at 42a. This provision prevents the Commonwealth from assigning a security officer to a new post if it would have the effect of reducing the complement of capitol police officers. Here, because capitol police officers have been assigned to each of the five new security stations, the complement of capitol police officers has increased, not decreased. In spite of this fact, the arbitrator concluded that the operation of security devices was a post that could be assigned only to capitol police officers.

---

1. According to evidence presented to the arbitrator, security officers perform "routine security or introductory police work." Commonwealth Ex 1, Reproduced Record at 16a (R.R. ____). They patrol assigned areas in the Capitol Complex "to protect and guard property or persons from fire, theft, trespass or other hazards." *Id.* Their work can involve regulating "the activities of ... the general public, and may include performing limited police duties." *Id.*

By contrast, capitol police officers do "general duty police work in protecting Commonwealth employees, public officials, the general public, property and facilities, and enforcing the Pennsylvania Crimes Code and the Motor Vehicle Code." Commonwealth Ex. 2, R.R. 16a.

The "work" of each overlaps. Capitol police "protect" property and enforce criminal laws. Security officers regulate "activities of the general public" by, *inter alia*, doing "routine security work." Operating security machines seems work more appropriate for security officers.

The arbitrator agreed that Article 44, Section 2 of the CBA was implicated, and he acknowledged, at numerous points in his award, that the five new stations in the Capitol Complex were "new posts." However, the arbitrator reasoned that because the "Terry-type" stop and frisk search of a suspect had historically been the work of capitol police, it followed that the operation of x-ray machines and metal detectors was bargaining unit work "that should *remain* with the police officers." Award at 12. It is impossible to join the words "new post" and "remain" in a single sentence. If a post is new, how then can it "remain?"[2]

The absence of logic is not a basis for setting aside an arbitration award given our limited scope of review. The Act of June 24, 1968, P.L. 237, No. 111, 43 P.S. §§ 217.1–217.10, commonly known as Act 111, governs labor relations between police and fire employees and their public employers. Act 111 is elliptical, and the word "grievance" appears but once.[3] Our Supreme Court found that single appearance sufficient to support the conclusion that grievances must be resolved by binding interest arbitration.[4] *Pennsylvania State Police v. Pennsylvania State Troopers' Association (Betancourt)*, 540 Pa. 66, 656 A.2d 83 (1995). Further, the Supreme Court has established that grievances arbitrated pursuant to Act 111 are subject to the narrow certiorari scope of review, not the essence test. *Id.* at 78, 656 A.2d at 89. It did so for two reasons. First, the only type of arbitration specified in Act 111 is interest arbitration, an extension of collective bargaining. Second, the Supreme Court believed that it was the legislature's intent that labor disputes under Act 111 be resolved swiftly. Under this standard of review, courts are not free to set aside an award merely because it is against public policy. *See City of Philadelphia v. Fraternal Order of Police, Lodge No. 5*, 711 A.2d 1060 (Pa.Cmwlth.1998) (wherein this Court upheld an arbitration award reinstating an officer who had crashed a police cruiser under the influence of alcohol and cocaine because public policy was not a consideration). In sum, erroneous arbitration decisions that do not pass the essence test can, and do, survive narrow certiorari review.

Nevertheless, *Betancourt* did caution that an arbitrator may not exceed his authority under the narrow certiorari standard of review. *Betancourt*, 540 Pa. at 79, 656 A.2d at 90. The Commonwealth argues that the arbitrator here exceeded his authority by adding language to the CBA. Specifically, it contends that the arbitrator added to the terms of the CBA, and he was not permitted to do so. Indeed, the CBA states that,

> [t]he arbitrator shall neither add to, subtract from, nor modify the provisions of this Agreement.

---

2. It is true that work cannot be shifted away from the bargaining unit without negotiation. *American Federation of State, County, Municipal Employees, Council 13, AFL–CIO v. Pennsylvania Labor Relations Board*, 150 Pa. Cmwlth. 642, 616 A.2d 135 (1992). The arbitrator tried to draw on this principle, reasoning that because a stop and frisk "Terry-type" search was bargaining unit work, mechanical "searches" could only be done by capitol police. A pat down search bears no relationship to putting a purse through an x-ray scanner, and it is sheer sophistry to argue otherwise.

3. Act 111 states, simply, that "[p]olicemen and firemen ... have the right to an adjustment of settlement of their grievances or disputes in accordance with the terms of this act." Section 1 of Act 111, 43 P.S. § 217.1.

4. *See* Kurt H. Decker, *Assessing Pennsylvania's Police and Fire Collective Bargaining as Its Silver Anniversary Approaches*, 29 Duquesne Law Review 695, 695–718 (Summer, 1991). Decker recommends, *inter alia*, a comprehensive legislative revision to give the Pennsylvania Labor Relations Board jurisdiction and in other ways fill the ellipses in the current statutory scheme.

Article 27, Section 2, R.R. 39a. This Court has also stated that an arbitrator cannot add "previously non-existent provisions to a collective bargaining agreement." *Township of Ridley v. Fraternal Order of Police Lodge No. 27*, 718 A.2d 872, 875 (Pa.Cmwlth.1998).

The arbitrator added a new provision to Article 44, Section 2 of the CBA, to reach the conclusion that the operation of an x-ray machine and a walk-through metal detector required, exclusively, the hands of a capitol police officer.[5] The arbitrator adopted a "similarity principle" to reason that machine searches of purses are like a pat-down search of a suspect.[6] This similarity principle is not very workable because it can just as easily support the conclusion that security officers should check members of the public entering buildings. Further, this principle is nowhere stated in the CBA. In applying his new rule, the arbitrator also disregarded the Commonwealth's managerial prerogative to "plan, direct and control the operation of all equipment and other property of the Employer." CBA, Article 2, Section 1;

R.R. 37a. It is a small wonder that in two other arbitrations, also raising Article 44, Section 2 of the CBA, the Union was unsuccessful in pursuing its grievance.[7]

The controlling question here is whether the arbitrator exceeded his authority. In *Ridley*, we held out the possibility that an award that does violence to the language of the CBA can be set aside; however, we have never set aside an award for this reason. The most extreme example is *Bensalem Township* where this Court found that an arbitrator did not exceed his authority in awarding 21 months backpay even though the CBA expressly limited backpay to 12 months. Unless the arbitrator orders an illegal act or an act that the Commonwealth cannot do voluntarily, the arbitrator does not exceed his authority. *Bensalem*, 803 A.2d at 242. Thus, even where an arbitrator's award does violence to the words of the agreement, "we cannot say, unfortunately, that [the arbitrator] exceeded his authority." *Id.* at 242.

Because the arbitrator ordered the Commonwealth to do that which it could have done voluntarily, the award must be

5. Notably, the Union's chief witness acknowledged he had never before operated these machines.

6. The Union, citing to *County of Allegheny v. Allegheny County Prison Employees Independent Union*, 476 Pa. 27, 381 A.2d 849 (1977) argues that past practice supports the arbitrator's decision. Its reliance on this holding is misplaced. First, in *Allegheny*, the Supreme Court declined to use past practice as a tool for interpreting the CBA at issue. Second, the Supreme Court's past practice discussion was based entirely upon the observations of a commentator, R. Mittenthal, *Past Practice and the Administration of Collective Bargaining Agreements*, Proceedings Of The 14th Annual Meeting Of The National Academy Of Arbitrators 30 (1961). Mittenthal makes clear that the only basis for using a past practice is its "clarity and consistency. A course of conduct which is vague and ambiguous or which has been contradicted as often as it has been

followed can hardly qualify as a practice." *Id.* at 32, 381 A.2d 849.

It is impossible to use past practice here. The metal detectors and x-ray machines in question were brand new. There simply was no past practice, let alone a clear and consistent practice.

7. On February 8, 2005, Arbitrator Scott F. Bucheit held that the Commonwealth did not violate Article 44, Section 2 of the CBA by assigning a receptionist, not a capitol police officer, to the new post of providing security and reception services at a state building in Harrisburg. R.R. 76a–90a. On March 5, 2005, Arbitrator Martha R. Cooper, found that the Commonwealth did not violate Article 44, Section 2 of the CBA when it assigned to the new post of providing security in the office lobby to security officers because it did not reduce the complement of capitol police. R.R. 51a.–75a.

affirmed. However, the award cannot be supported by the language of the CBA. The Union has agreed in Article 44, Section 2 to allow the Commonwealth managerial discretion to decide whether to assign a new post to a capitol police officer or to a security officer. Whenever the Commonwealth exercises that discretion, the Union responds with a grievance. This disregard of the CBA erodes the value of collective bargaining under Act 111, but until *Betancourt* is revisited or Act 111 amended, no other result is possible.[8]

Judge LEADBETTER and Judge COHN JUBELIRER join in this concurring opinion.

---

**8.** *See* John P. McLaughlin and Patrick J. Harvey, *Betancourt and the Narrow Certiorari Scope of Review of Appeals from Act 111 Grievance Arbitration Awards,* 5 University of Pennsylvania Labor of Journal & Employment 427, 427–439 (Spring, 2003), for a strong criticism of the current state of the law in this area.