**PENNSYLVANIA STATE PARK OFFICERS ASSOCIATION,**
Petitioner

v.

**PENNSYLVANIA LABOR RELATIONS BOARD,**
Respondent.

**Capitol Police Lodge 85, Fraternal Order of Police, Petitioner**

v.

**Pennsylvania Labor Relations Board, Respondent.**

Commonwealth Court of Pennsylvania.

Argued March 29, 2004.

Decided July 22, 2004.

Gary M. Lightman, Harrisburg, for petitioner.

Warren R. Mowery, Harrisburg, for respondent.

BEFORE: McGINLEY, Judge, and LEAVITT, Judge, and MIRARCHI, JR., Senior Judge.

OPINION BY Judge LEAVITT.

In these consolidated cases, the Pennsylvania State Park Officers Association (PSPOA) and the Capitol Police Lodge 85, Fraternal Order of Police (FOP) (collectively Complainants) seek review of the refusal of the Pennsylvania Labor Relations Board (Board) to issue a complaint against the Commonwealth for allegedly engaging in unfair labor practices. In this appeal, we are confronted with an issue of first impression: whether the Commonwealth's discontinuation of longevity wage increases mandated by an expired collective bargaining agreement was an unfair labor practice under the act commonly known as Act 111[1] and Section 6 of the Pennsylvania Labor Relations Act (PLRA).[2]

---

1. Act of June 24, 1968, P.L. 237, *as amended,* 43 P.S. §§ 217.1–217.27. Act 111 provides generally for collective bargaining between police officers, firefighters and their public employers over the terms and conditions of employment and, in the event of a bargaining impasse, for compulsory and binding arbitration with no right to strike. *Philadelphia Fire Officers Association v. Pennsylvania Labor Relations Board,* 470 Pa. 550, 553–554, 369 A.2d 259, 260 (1977).

2. Act of June 1, 1937, P.L. 1168, *as amended,* 43 P.S. § 211.6. Act 111 contains no provisions concerning the collective bargaining obligations of employers and collective bargaining agents. Because the Supreme Court of Pennsylvania has determined that the PLRA and Act 111 are to be read *in para materia, Philadelphia Fire Officers Association,* 470 Pa. at 555, 369 A.2d at 261, unfair labor practice charges regarding violations of Act 111 are to be brought under the provisions of Section 6 of the PLRA. *Delaware County Lodge # 27, Fraternal Order of Police v. Pennsylvania Labor Relations Board,* 75 Pa.Cmwlth. 192, 461 A.2d 1337, 1338 n. 7 (1983).

## I. FACTUAL AND PROCEDURAL BACKGROUND

PSPOA is the exclusive bargaining agent for Pennsylvania State Park Officers employed by the Commonwealth. A collective bargaining agreement, effective June 11, 2001 through June 30, 2003, provided park officers in the first eight years of employment an automatic step increase upon the anniversary of their hire date. Park officers with more than eight years of service receive longevity payments automatically upon their anniversary, payable in the first full pay period following their anniversary date. Reproduced Record at 32a–35a (R.R. ——).[3]

Complainant FOP is the exclusive bargaining agent for Pennsylvania Capitol/Airport Police Officers, also employed by the Commonwealth. Under the terms of their collective bargaining agreement, effective July 1, 1999 through June 30, 2003, officers in this unit who are in the first four years of employment receive an automatic step increase in salary upon the anniversary of their hire date. Officers with more than four years of service receive longevity payments automatically upon their anniversary, also payable in the first full pay period following their anniversary date.

Article 22 of the PSPOA agreement and Article 24 of the FOP agreement contain identical provisions regarding health benefits. The agreements acknowledge that a jointly administered, multi-union Health and Welfare Fund, known as the Pennsylvania Employees Benefit Trust Fund (PEBTF), was established under a trust agreement between AFSCME, AFL–CIO and the Commonwealth. The PEBTF Board of Trustees has sole discretion to determine the extent and level of health insurance and benefits to be extended by PEBTF to the officers and other state employees covered by the trust agreement.

PSPOA commenced bargaining with the Commonwealth over a successor agreement on May 28, 2002. Negotiations were unsuccessful, and on November 18, 2002, PSPOA requested the appointment of a board of arbitration. Collective bargaining between the Commonwealth and FOP commenced on November 25, 2002, and it was also unsuccessful. FOP requested the appointment of a board of arbitration on March 10, 2003. Both collective bargaining agreements expired on June 30, 2003, without a successor agreement in place.

On July 24, 2003, before arbitration had commenced in either case, Robert S. Barnett, Secretary of Administration for the Commonwealth, issued the following written notification to each Complainant:

The current state of the law in Pennsylvania requires the Employer, in the absence of a new collective bargaining agreement or interest arbitration award, to maintain the status quo as of the contract expiration date which is June 30, 2003. Therefore, please be advised that in order to maintain the status quo as required by law as of June 30, 2003, the Commonwealth will not process any salary increases, including increments and longevity increases during the period when there is no contract in place.

Unfair Labor Practices Charge, Exhibit B; R.R. 55a. By separate correspondence also dated July 24, 2003, Barnett advised Complainants that the PEBTF Board of Trustees had, pursuant to its authority

---

3. Citations to the collective bargaining agreements in this opinion are to the PSPOA contract, which appears in the reproduced record. The FOP contract is identical in all respects except for the minimum length of service required for a longevity wage increase.

under the now expired collective bargaining agreements, passed a resolution on July 17, 2003, changing the officers' health and medical benefits. Unfair Labor Practices Charge, Exhibit C; R.R. 56a.

█ Complainants filed a charge of unfair labor practices with the Board claiming that the Commonwealth had violated Section 6(1)(a) and (e) of the PLRA[4] by unilaterally ceasing longevity wage increases and by unilaterally altering the officers' health benefits during the interest arbitration process.[5] Complainants also charged the Commonwealth with discrimination under Section 6(1)(c) of the PLRA.[6] The Secretary of the Board (Secretary) reviewed the allegations and, by letter to each Complainant dated September 5, 2003, declined to issue an unfair labor practice complaint against the Commonwealth. The Secretary reasoned as follows:

> [T]he status quo following contract expiration does not include the continuation of periodic wage adjustments. *Fairview School District v. Unemployment Compensation Board of Review*, 499 Pa. 539, 454 A.2d 517 (1982). Furthermore, Article 24 of the collective bargaining agreement does not support your charge that the employer altered the contractual health care benefits. In addition, you have failed to allege facts which support

your claim of discrimination. Accordingly, your Charge of Unfair Labor Practices is dismissed.

R.R. 62a.

Complainants filed exceptions to the Secretary's decision and, in accordance with the Board's regulations, alleged additional facts in support of their charges. According to Complainants, it was the past practice of the Commonwealth to continue to pay automatic longevity increases during "gap periods" between expiration of the collective bargaining agreement and the implementation of a successor agreement. This, Complainants argued, was the established course of conduct between the Commonwealth and their members as well as other bargaining units such as the Pennsylvania Liquor Control Association. In support of their discrimination claims, Complainants noted that on July 11, 2003, the Commonwealth and AFSCME, its largest union, had ratified a pattern settlement, which Complainants had rejected in favor of arbitration. Complainants contended that it was only after they rejected the pattern settlement that the Commonwealth decided not to process automatic longevity increases, purportedly because there was no contract in place, while at the same time modifying the officers' health benefits pursuant to the provisions of the

---

4. The relevant provisions of Section 6 of the PLRA are as follows:

(1) It shall be an unfair labor practice for an employer—
(a) To interfere with, restrain or coerce employes in the exercise of the rights guaranteed in this act.

\* \* \*

(e) To refuse to bargain collectively with the representatives of his employes, subject to the provisions of section seven (a) of this act.
43 P.S. § 211.6.

5. The term "interest arbitration" refers to arbitration which occurs when the employer and employee are unable to agree on the terms of a collective bargaining agreement. *Pennsylvania State Police v. Pennsylvania State Troopers Association*, 559 Pa. 586, 588, 741 A.2d 1248, 1250 n. 2 (1999).

6. Section 6(1)(c) provides that "[i]t shall be an unfair labor practice for an employer ... [b]y discrimination in regard to hire or tenure of employment, or any term or condition of employment to encourage or discourage membership in any labor organization." 43 P.S. § 211.6(i)(c).

expired contract.[7] In Complainants' view, the timing of the Commonwealth's actions supported an inference of anti-union *animus*.

The Board affirmed the Secretary's decision not to issue a complaint and dismissed Complainants' exceptions. This appeal followed.

Complainants raise two issues for our consideration. They first argue that the Board erred as a matter of law in affirming the decision of the Secretary not to issue a complaint on the charge of unfair labor practices under Section 6(1)(a) and (e) of the PLRA. Complainants also contend that the Board arbitrarily and capriciously disregarded their claims of discrimination under Section 6(1)(c).

## II. STANDARD AND SCOPE OF REVIEW

■ All final Board orders, including those refusing to institute an unfair practice complaint, are subject to judicial review. *Delaware County Lodge # 27, Fraternal Order of Police v. Pennsylvania Labor Relations Board,* 75 Pa.Cmwlth. 192, 461 A.2d 1337, 1339 (1983). The issuance of an unfair practice complaint is a discretionary determination of the Board. 43 P.S. § 211.8(b).[8] When the Board assumes that alleged facts are true and where the allegations do not demonstrate an unfair labor practice, the Board properly declines to issue a complaint. *Pennsylvania State Troopers Association v. Penn-*

*sylvania Labor Relations Board,* 809 A.2d 422, 426 (Pa.Cmwlth.2002). We do not set aside the Board's discretionary acts in the absence of bad faith, fraud, capricious action or abuse of power. *Delaware County Lodge,* 461 A.2d at 1340. Given the Board's administrative expertise in the area of public employee labor relations, "great deference ought to be given to the [Board]'s assessment of the often competing concerns relevant to the issue of whether the conduct of an employer or a union constitutes a refusal to meet the mutual obligation to bargain in good faith." *City of Philadelphia v. Pennsylvania Labor Relations Board,* 138 Pa.Cmwlth. 113, 588 A.2d 67, 71 (1991) (quoting *Richland School District v. Pennsylvania Labor Relations Board,* 71 Pa.Cmwlth. 45, 454 A.2d 649, 652 (1983)).

## III. ANALYSIS

### A. Status Quo

■ Complainants' primary argument is that the Commonwealth, by refusing to pay longevity wage increases post contract expiration, unlawfully altered the *status quo.* In Complainants' view, this was an unfair labor practice under Section 6(1)(a) and (e) of the PLRA, 43 P.S. § 211.6(1)(a) and (e).[9]

■ The threshold determination is whether a contract term is a mandatory subject of bargaining; employers are barred from acting unilaterally with re-

---

7. In their exceptions to the Secretary's decision, Complainants abandoned their claim that the alteration of the officers' health benefits constituted an unfair labor practice. They continue to raise this point to support their argument that the Commonwealth has asserted contradictory bargaining positions.

8. Section 8(b) of the PLRA provides, in pertinent part, as follows:

Whenever it is charged that any person has engaged in or is engaging in any such unfair labor practice, the board ... *shall have authority to issue* and cause to be served upon such person a complaint, stating the charges in that respect, and containing a notice of hearing before the board.
43 P.S. § 211.8(b) (emphasis added).

9. *See* n. 4 *supra* for text of the relevant statutory provisions.

gard to a mandatory subject without satisfying the applicable statutory resolution procedure. *Plumstead Township v. Pennsylvania Labor Relations Board,* 713 A.2d 730, 733 (Pa.Cmwlth.1998). Under Act 111, a matter is deemed a mandatory subject of bargaining if it bears a rational relationship to the employees' duties. *Id.* In this case, there is no dispute that the officers' compensation structure is a mandatory subject of bargaining under either the "rational relationship" test or the plain language of Act 111.[10] Thus, any unilateral change by the Commonwealth with respect to the officers' compensation would be an unfair labor practice in violation of Sections 6(1)(a) and (e) of the PLRA. *Id.* (finding that policy allowing police officers to take their patrol vehicle home was a mandatory subject of bargaining and that Township, by unilaterally discontinuing the policy, committed unfair labor practices in violation of Sections 6(1)(a) and (e) of PLRA and Act 111).

▮▮▮ The Board acknowledged the foregoing principles, noting in its opinion that an employer is obligated to maintain the *status quo* during contract hiatus while the

parties are negotiating a successor agreement.[11] As aptly observed by the Board, however, the distinct legal issue in the present case is *how to define the status quo.* The Board found that it means freezing wages at the moment the collective bargaining agreements expired. Complainants, on the other hand, argue that maintaining the *status quo* means increasing their members' wages according to the automatic wage escalators, as provided in the expired agreements.

In addressing this legal issue, the Board found *Fairview School District v. Unemployment Compensation Board of Review,* 499 Pa. 539, 454 A.2d 517 (1982) to be controlling. In *Fairview,* a collective bargaining agreement between the teachers' union and the school district expired on August 26, 1979, and a successor contract was not in place when the teachers reported for work on September 5, 1979. The teachers received their regularly scheduled bi-weekly paychecks on September 7, 1979, which were computed on the basis of the prior school year's salary matrix set forth in the expired agreement. The checks did not include any step-up in pay based on an

---

**10.** Section 1 of Act 111 states, in pertinent part, that "Policemen or firemen employed by ... the Commonwealth *shall,* through labor organizations or other representatives ... have the right to bargain collectively with their public employers concerning the terms and conditions of their employment, *including compensation.*" 43 P.S. § 217.1 (emphasis added).

**11.** *See, e.g., Appeal of Cumberland Valley School District,* 483 Pa. 134, 394 A.2d 946 (1978). In *Appeal of Cumberland Valley School District,* our Supreme Court held that a public employer violated its duty to bargain under the Public Employe Relations Act, Act of July 23, 1970, P.L. 563, *as amended,* 43 P.S. § 1101.101—1101.2301, by unilaterally discontinuing payment for various insurance benefits and other terms and conditions of employment that were provided in the parties' expired collective bargaining agreement.

This principle has been commonly referred to as the Cumberland Doctrine. *Norwin School District v. Belan,* 510 Pa. 255, 265, 507 A.2d 373, 378 n. 7 (1986). Federal decisional law, from which this principle was derived, follows the same rationale. *See, e.g., NLRB v. Katz,* 369 U.S. 736, 744, 82 S.Ct. 1107, 8 L.Ed.2d 230 (1962) (holding that Employer violated statutory duty to bargain collectively by unilaterally granting merit increases and changing policies pertaining to sick leave and wage increases while carrying on contract negotiations with union on those matters). This doctrine was designed to encourage the continuation of the work relationship for a reasonable period of time under terms previously and mutually agreed to by the parties during the period between expiration of the old agreement and execution of a successor agreement.

additional year of service beyond the 1978–1979 school year covered by the expired contract.

The union filed a grievance, alleging that the district had violated the extended collective bargaining agreement by failing to step-up the teachers' salaries based on an additional year of service. A work stoppage commenced on September 14, 1979, and continued until October 22, 1979, prompting several teachers to file claims for unemployment compensation benefits for that period. The Employment Security Office denied benefits, and the referee affirmed, on the basis that claimants were engaged in a labor dispute and were therefore ineligible under Section 402(d) of the Pennsylvania Unemployment Compensation Law.[12] The Unemployment Compensation Board of Review reversed and held that claimants were not ineligible under Section 402(d). This Court affirmed the Board's decision, and the district appealed.

Our Supreme Court reversed and reinstated the referee's denial of benefits. In order to decide whether the work stoppage constituted a strike or a lockout, the Court had to determine which side, union or management, first refused to continue operations under the *status quo* after the contract had expired. For purposes of its analysis, the Court defined the *status quo* as "the last actual, peaceable and lawful noncontested status which preceded the controversy." *Fairview,* 499 Pa. at 544, 454 A.2d at 520. The Court concluded that the district did not violate the *status quo* by refusing to pay stepped-up salary increases after the collective bargaining agreement expired, reasoning as follows:

> The underlying rationale for the status quo requirement is that during the interim period between contracts, the employer may continue operations and the employee may continue working, while the parties are free to negotiate on an equal basis in good faith. Maintenance of the status quo is merely another way of stating that the parties must continue the existing relationship in effect at the expiration of the old contract. *To require the School District to pay stepped up salary increases beyond the specified years contained in the expired contract changes the existing relationship in the context of the terms and conditions subject to the very negotiations sought to be fostered.*
>
> We therefore hold that the School District's refusal to pay stepped up salaries did not constitute a disruption of the status quo.

*Id.,* 499 Pa. at 546–547, 454 A.2d at 521 (emphasis added). *See also Union City School District v. Unemployment Compensation Board of Review,* 499 Pa. 548, 454 A.2d 522 (1982) (companion case to *Fairview* reaching same result). Echoing the *Fairview* court's rationale, the Board argues that the Commonwealth was not obligated to pay longevity wage increases to Complainants' members since wages were one of the matters under negotiation.

Complainants argue that *Fairview* is distinguishable because that case concerned "stepped-up" salary increases whereas the present controversy concerns discrete longevity wage increases that the Commonwealth contemplated having to make regardless of the outcome of arbitration. In our view this is a distinction without a difference. Both schemes provide financial rewards based upon an employee's length of service, and in this case

---

12. Act of December 5, 1936, Second Exec. Sess., P.L. (1937) 2897, *as amended,* 43 P.S. § 802(d). Under Section 402(d), an employee is ineligible for unemployment benefits for any week "[i]n which his unemployment is due to a stoppage of work, which exists because of a labor dispute (other than a lockout)."

the incentives were part of the overall salary structure that was a mandatory subject of bargaining between the parties.

Complainants also argue that *Fairview* is distinguishable because their members were precluded from striking under Act 111 during contract hiatus whereas the teachers in *Fairview* possessed such a right. Consequently, Complainants believe that the *Fairview* rule cannot be applied in this case or any other involving Act 111 employees.[13] We find this argument unavailing. As the Board observed, the statutory bargaining scheme under Act 111 does not contemplate the sort of contract hiatus that occurred here. The Act aims to avoid this exact situation by establishing strict timetables that require collective bargaining to begin at least six months before the start of the Commonwealth's fiscal year. 43 P.S. § 217.3. *See Cheltenham Township Police Association v. Cheltenham Township*, 152 Pa.Cmwlth. 338, 618 A.2d 1234 (1992). Any request for arbitration must be submitted at least 110 days before the start of the fiscal year. Although the parties complied with this deadline, arbitration did not commence until months after the collective bargaining agreements had expired. Regardless of the reason for the delay in this or in any other case, we must be mindful of Act 111's deadlines and its goal of encouraging good faith collective bargaining. To interpret *status quo* as suggested by Complainants would allow employees to gain an unfair advantage over their public employers by obtaining the very wage increases under negotiation. This would discourage good faith negotiations and compliance with the Act 111 deadlines.

■ We also disagree with Complainants' suggestion that the definition of "*status quo*" should vary according to the context in which a controversy arises. Our Supreme Court has established that the *status quo* is always the "last actual, peaceable and lawful non-contested status which preceded [a] controversy." *Fairview*, 499 Pa. at 544, 454 A.2d at 520. It is a theoretical level playing field on which the parties begin negotiations for a successor agreement. It matters not whether the underlying controversy involves a la-

---

**13.** Complainants analogize their situation to cases arising under the Act commonly known as the Transportation Act, Act of November 27, 1967, P.L. 628, 53 P.S. § 39951. Like Act 111, the Transportation Act requires parties to submit their labor disputes to arbitration rather than resort to a work stoppage. Specifically, Complainants cite two Transportation Act cases in which they contend the Board adopted a position diametrically opposed to its position here: *Lehigh and Northampton Transportation Authority*, 16 PPER ¶ 16061 (1985) (*LANTA*) and *Berks Area Reading Transportation Authority*, 16 PPER ¶ 16130 (1985) (*BARTA*). In both cases the Board held that a public employer was not entitled to eliminate cost-of-living adjustments provided under terms of an expired collective bargaining agreement during the *status quo* period pending conclusion of negotiations for a successor agreement.
The Board distinguished *LANTA* and *BARTA* as follows:

The facts presented here do not involve rescission of contractual benefits in the expired contract as a bargaining tactic, as involved [BARTA], nor a unilateral implementation of a last offer as in [LANTA]. Here, the issue placed squarely before the Board is to define the status quo, a question not presented in the [LANTA] and [BARTA] cases.

Final Order at 5. Because this Court is required to give great deference to the administrative expertise of the Board, *South Park Township Police Association v. Pennsylvania Labor Relations Board*, 789 A.2d 874, 878 (Pa.Cmwlth.2002), we shall defer to its interpretation of its own decisions. The Board also points out that LANTA and BARTA, as decisions of an administrative tribunal, are not binding on this Court. We agree and add that those decisions, to the extent that they contradict *Fairview*, must yield to our Supreme Court's pronouncement in that case.

bor dispute or eligibility for unemployment benefits. In our view, it would only lead to confusion to define the *status quo* differently from one situation to the next.

Complainants argue that this Court's decision in *New Castle Area School District v. Unemployment Compensation Board of Review*, 159 Pa.Cmwlth. 611, 633 A.2d 1339 (1993), and not *Fairview*, is dispositive of the *status quo* issue. Like *Fairview, New Castle* involved the eligibility of striking employees for unemployment benefits. Complainants argue that *New Castle* stands for the proposition that an employer's refusal to continue longevity wage increases during contract hiatus constitutes an unlawful, unilateral change in the *status quo*.

Upon closer examination we find that *New Castle* is distinguishable. In that case, the collective bargaining agreement provided for a system of incremental pay increases for teachers based both on longevity of service and on academic credits they received for additional educational courses and advanced degrees. After the contract expired, the school district made a written offer to the teachers' union providing for all of the terms and conditions of the former contract to remain in place; no salary increases were to be effectuated until a successor agreement was reached. The union did not formally respond to the district's offer, although the teachers reported to work at the beginning of the academic year. Notwithstanding the parties' implied agreement that wages would be frozen, the district paid increments to those teachers who had earned educational credits but not to those who were entitled to longevity increases. The district also unilaterally implemented a new schedule at one of its schools and adopted a resolution that resulted in the removal of a vending machine at another school. The preceding three factors precipitated a work stoppage by the teachers. In determining whether the teachers were eligible for unemployment benefits, this Court agreed with the referee and the Board that the school district had caused a lockout. We reasoned as follows:

[T]he School District, *in violation of its understanding with the Union*, unequivocally and unilaterally effectuated multiple changes in the status quo by: altering class schedules at one of its nine schools; *paying certain teachers salary increments based on academic credits while not paying increments to others based on longevity;* and authorizing Coca–Cola machines, when the selection of faculty lounge beverage machines was to be made by a designated faculty committee.

*New Castle*, 633 A.2d at 1344 (emphasis added).

In our view, *New Castle* is not dispositive of the issue in the present case. With regard to salary increments, the school district's actions were a disruption of the *status quo* because the district and the union had a separate agreement barring *any* salary increases until a new contract was in place. There was no such agreement between the Commonwealth and Complainants in this case. An additional factor not present in this case was the school district's seemingly arbitrary decision to honor one type of increment and not another. Such disparate treatment may, in and of itself, constitute an unfair labor practice. In any event, even if Complainants' interpretation of *New Castle* were correct, that decision must yield to our Supreme Court's clear holding in *Fairview* that a public employer's refusal to pay stepped up salary increases is not a disruption of the *status quo*.

In sum, we agree with the Board that *Fairview* is not only controlling here but reflective of sound labor policy. Recogniz-

ing that the issue of contractual wage increases during a *status quo* period was one of first impression, the *Fairview* court cited two cases from other jurisdictions as persuasive. One of those cases, *Board of Cooperative Educational Services of Rockland County v. New York State Public Employment Relations Board*, 41 N.Y.2d 753, 395 N.Y.S.2d 439, 363 N.E.2d 1174 (1977), is particularly instructive to our analysis.

In *Rockland County*, a labor dispute arose between the Board of Cooperative Educational Services, a public employer, and the union representing its instructional employees. The employer refused to pay step increments to returning unit employees, opting instead to maintain salaries at the rate in effect at the expiration of the former collective bargaining agreement. The New York State Public Employment Relations Board ordered the employer to negotiate in good faith,[14] cease and desist from refusing to pay the increments and make retroactive payments to affected employees. The Court of Appeals reversed, holding that "it is not a violation of a public employer's duty to negotiate in good faith to discontinue during the negotiations for a new agreement the payment of automatic annual salary increments, however long standing the practice of paying such increments may have been." *Id.* at 1175.[15]

The Court of Appeals began its analysis by recognizing that there are fundamental distinctions between public and private employers. It acknowledged the benefits inherent in the concept of longevity wage increases; employees receive a financial reward for their commitment to the employer and the employer benefits by retaining experienced personnel and expending less time and resources on training. The *Rockland County* court concluded, however, that requiring public employers to pay longevity wage increments following expiration of a collective bargaining agreement is "fraught with problems, equitable and economic in nature." *Id.* at 1177. For instance, public employers conduct their operations using public money and so face unique budgetary pressures. As the Court eloquently observed,

> [i]n thriving periods the increment of the past may not squeeze the public purse, nor may it on the other hand be even fair to employees, but in times of escalating costs and diminishing tax bases, many public employers simply may not be able in good faith to continue to pay automatic increments to their employees.

*Id.*

The same concerns hold true for the Commonwealth in this case, which faced its own budgetary crisis during the summer of 2003 when the present controversy developed. Although the longevity wage increases may have been economically feasible for the Commonwealth when it executed the now-expired collective bargaining agreements, that presumption is certainly subject to change from one budgetary cycle to the next. It would be unfair to compel the Commonwealth, or any governmental entity, to maintain fi-

---

14. We note that the relevant provision of New York's Public Employees' Fair Employment Act is substantially similar to Section 6(1)(e) of the PLRA. In defining "improper employer practices," the New York State Assembly declared that "[i]t shall be an improper practice for a public employer or its agents deliberately ... (d) to refuse to negotiate in good faith with the duly recognized or certified representatives of its public employees." N.Y. Civil Service Law § 209–a(1) (2004).

15. Complainants in this case also raise a "past practice" argument in support of their allegation that the Commonwealth committed an unfair labor practice. This aspect of Complainants' theory is discussed more fully *infra*.

nancial commitments in perpetuity in the face of a shrinking tax base, declining population or any other unforeseen adverse circumstance.

The New York Court of Appeals also flatly rejected the union's argument that payment of the increments preserves the existing relationship between the parties until different conditions are established through collective bargaining. In the Court's view, this argument was based on the erroneous assumption that it is the "existing relationship" which is being preserved when, in reality, forcing an employer to pay incremental wage increases not only changes the relationship established by the parties but gives a bargaining advantage to the union by making negotiation of that point more difficult. Similarly, requiring the Commonwealth to make longevity payments essentially removes that issue from the bargaining process and forces the Commonwealth to come to the table already burdened with a wage scheme that may no longer be economically viable. The effect would be to threaten the tenuous balance in bargaining power between public employers and their employees.

One final observation by the *Rockland County* court regarding the *status quo* issue is worth repeating here:

To say that the status quo must be maintained during negotiations is one thing; to say that the status quo includes a change and means automatic increases in salary is another. *The matter of increments can be negotiated and, if it is agreed that such increments can and should be paid, provision can be made for payment retroactively.*

*Id.* (emphasis added). This analysis is equally applicable to the situation before us, where nothing in the expired collective bargaining agreements indicated an intention to extend the scheduled wage increases beyond June 30, 2003.[16] Going forward, whenever Complainants and the Commonwealth negotiate wage terms, they must necessarily decide whether to abolish the longevity wage scheme altogether or, if it is continued in the successor agreement, whether to compensate affected officers retroactively. The parties are quite capable of anticipating the present scenario and can negotiate an appropriate course of action to follow during "gap" periods between contracts.

### B. Past Practice

█ As an alternative to their *status quo* argument, Complainants contend that the Commonwealth committed an unfair labor practice by repudiating a binding past practice. Complainants aver that, historically, the Commonwealth has paid

16. The absence of such an agreement between the employer and the union was a dispositive factor in the other foreign case cited by our Supreme Court in *Fairview: M.S.A.D. No. 43 Teachers' Association v. M.S.A.D. No. 43 Board of Directors*, 432 A.2d 395 (Me.1981) In that case, the public employer paid newly hired teachers by applying the salary schedule set forth in the expired collective bargaining agreement. The employer paid returning teachers the same salary that they received in the prior school year, as though the agreement had expired. The Supreme Judicial Court of Maine affirmed an order of the Maine Labor Relations Board that employer cease this practice. Quoting the Board, the Supreme Judicial Court noted that "[employer] . . . acted properly in paying the returning teachers at the same step which the teachers occupied during the 1977–78 school year. In *Easton Teachers Association v. Easton School Committee*, M.L.R.B. No. 79–14 at 7 (1979), we held that during the interim period between expiration of a contract and execution of a successor contract, 'the status quo should be maintained as if the existing conditions were frozen rather than to give effect to a built-in wage escalator.'" *Id.* at 397 (citing *Rockland County* decision for support).

longevity wage increases to the officers during interim periods between collective bargaining agreements. Complainants suggest that when the Commonwealth repudiated this practice for the first time in 2003 it committed an unfair labor practice.[17]

In *County of Allegheny v. Allegheny County Prison Employees Independent Union*, 476 Pa. 27, 381 A.2d 849 (1977), our Supreme Court queried whether, in an arbitration of a grievance by public employees under a collective bargaining agreement, an award sustaining the grievance may be based on a practice that existed during a period prior to the agreement. The Court recognized four situations in which so-called evidence of "past practice" may be used in labor arbitration proceedings:

> (1) to clarify ambiguous language; (2) to implement contract language which sets forth only a general rule; (3) to modify or amend apparently unambiguous language which has arguably been waived by the parties; and (4) to create or prove a separate, enforceable condition of employment which cannot be derived from the express language of the agreement.

*Id.*, 476 Pa. at 34, 381 A.2d at 852. Complainants analogize the Commonwealth's actions to the fourth situation.

*County of Allegheny* is readily distinguishable from the present case, as it arose in the context of a grievance arbitration during the term of a collective bargaining agreement. There, the Court had to determine whether the parties implicitly incorporated into their agreement, as a separately enforceable condition of their employment relationship, practices which prevailed in the past that were neither repudiated in the agreement nor inconsistent with its terms. Complainants cite no authority for their novel application of past practice analysis here, which would, in effect, incorporate a term into an expired collective bargaining agreement while the parties are engaged in negotiation of a successor agreement.

Even if the past practice inquiry were appropriate in this context, the express language of the expired collective bargaining agreements precludes its application. The agreements each contain an identical integration clause, which provides:

> The Commonwealth and the Union acknowledge that this Agreement represents the results of collective negotiations between said parties and constitutes the entire Agreement between the parties for the duration of the life of said Agreement; each party waiving the right to bargain collectively with each other with reference to any other subject matter, issue, or thing whether specifically covered herein or wholly omitted herefrom and irrespective of whether said subject was mentioned or discussed dur-

---

17. We note that Complainants refer to this argument in their briefs as an alternative basis for finding that the Commonwealth failed to bargain in violation of Section 6(1)(a) and (e) and Act 111. They devote the vast majority of the argument section that follows, however, to the *"status quo"* issue discussed previously. Complainants mention the *"past practice"* argument only in passing, or as support for their separate discrimination claim addressed later in this opinion. Complainants did, however, raise the past practice issue in their initial charge of unfair labor practices under Section 6(1)(a) and (e) of the PLRA. *See* Charge of Unfair Labor Practices, Specification of Charges, ¶ 8–10. In their exceptions to the Secretary's decision, Complainants stated more directly that based upon this well-established practice, payment of longevity increases during a 'gap' period was and is the *status quo.* Because the Board elected to review Complainants' repudiation of past practice claim, we shall likewise review the issue.

ing the negotiations preceding the execution of this Agreement.

R.R. 44a. Our Supreme Court was confronted with a similar clause in *County of Allegheny*. While acknowledging that implicitly incorporating past practices into a contract is proper in certain situations, the Court concluded that

> the existence in a contract of a broad integration clause, if it means anything, does clearly *negate the notion* that the parties meant to include any terms or conditions, including those based only on past practices, not specifically incorporated in the written contract or reasonably inferable from its provisions.

*Id.*, 476 Pa. at 37, 381 A.2d at 854 (emphasis added). Here, the parties could have provided for continuation of longevity wage increases beyond the term of the collective bargaining agreement, but they did not. The omission of such a provision is especially glaring because it relates to a mandatory subject of bargaining, *i.e.*, compensation. In short, the broad integration clause endorsed by the parties militates against incorporating the alleged past practice into the expired agreements.

We agree with the Board that mechanical adherence to past practice to resolve the present dispute over longevity wage increases would run afoul of the policy considerations discussed above. As the parties negotiate over wage issues, historic increases that were reflective of past economic conditions must necessarily yield to current economic and budgetary concerns, particularly for a public employer. As noted by the Board,

> we fundamentally disagree with [Complainants]' argument ... that the Com-

monwealth's alleged past payment of longevity increases during a previous contract hiatus binds the Commonwealth to present and future similar increases regardless of economic circumstances or relevant policy considerations.

Final Order at 3. We agree with the Board's analysis.

## C. Discrimination

■ In their second issue on appeal, Complainants argue that the Board erred by dismissing their charge of discrimination under Section 6(1)(c) of the PLRA. Under that section, it is an unfair labor practice for an employer, "[b]y discrimination in regard to ... any term or condition of employment to encourage or discourage membership in any labor organization." 43 P.S. § 211.6(1)(c). An unfair labor practice charge of discrimination based on union activity requires proof that the employer was motivated by an unlawful motive or displayed anti-union *animus*. *Uniontown Area School District v. Pennsylvania Labor Relations Board*, 747 A.2d 1271, 1274 (Pa.Cmwlth. 2000). In identifying anti-union *animus*, our Supreme Court has observed that the "motive creates the offense." *Pennsylvania Labor Relations Board v. Ficon*, 434 Pa. 383, 388, 254 A.2d 3, 5 (1969).

■ Whether to issue an unfair labor practice complaint is, as stated previously, a decision that lies within the discretion of the Board and is not set aside in the absence of bad faith, fraud or abuse of power.[18] In order for our review to be meaningful, the Board's adjudication must contain statements of the reasons and ba-

18. *Pennsylvania Social Services Local 668 v. Pennsylvania Labor Relations Board*, 481 Pa. 81, 85, 392 A.2d 256, 258 (1978). We do not review such a discretionary action in the absence of bad faith, fraud, capricious action or abuse of power. *Delaware County Lodge # 27, Fraternal Order of Police v. Pennsylvania Labor Relations Board*, 75 Pa.Cmwlth. 192, 461 A.2d 1337, 1340 (1983).

sis for the decision which are sufficient to demonstrate to this Court that the adjudication did not result from an abuse of discretion. *Pennsylvania Social Services,* 481 Pa. at 89, 392 A.2d at 260. When the Board assumes that alleged facts are true and where the allegations do not demonstrate an unfair labor practice, the Board properly declines to issue a complaint. *Pennsylvania State Troopers Association v. Pennsylvania Labor Relations Board,* 809 A.2d 422, 426 (Pa.Cmwlth.2002).

With this deferential standard of review in mind, we must determine whether Complainants' allegations, if true, would have clearly established a *prima facie* case of discrimination. If not, then the Board's dismissal of the Section 6(1)(c) charge must be upheld.

The Secretary declined to issue a complaint because Complainants failed to allege facts that supported their claim of discrimination. In their exceptions to the Secretary's decision, Complainants averred that they engaged in protected activity by rejecting the pattern settlement which the Commonwealth and its largest union ratified on July 11, 2003. Approximately two weeks later, on July 24, 2003, the Commonwealth notified Complainants in two separate letters that it would not process the longevity wage increases provided for in the expired agreements because there was no contract in place, and that the officers' health benefits were being altered in accordance with a resolution of the PEBTF Board of Trustees. Complainants alleged that the timing of the aforementioned actions demonstrated an unlawful retaliatory motive on the part of the Commonwealth. As further evidence of discrimination, Complainants argued that the Commonwealth took contradictory positions by relying on the expired agreements to effect a change in the officers' health insurance coverage while simultaneously arguing that the longevity wage provisions of those agreements were no longer effective.

The Board rejected Complainants' primary argument, citing to one of its previous decisions for the proposition that timing alone is not sufficient to raise an inference of anti-union *animus. AFSCME, AFL–CIO, Council 13 v. Department of Labor & Industry, Office of Vocational Rehabilitation,* 16 PPER ¶ 16020 (1984). The Board cannot be found to have abused its discretion by relying upon its own established precedent. We also agree with the Board that Complainants' factual assertions support a completely innocuous interpretation of the timing of the Commonwealth's actions. The Commonwealth's position letters dated July 24, 2003 simply coincided with the expiration of the collective bargaining agreements on June 30, 2003.

The Board also found no merit to Complainants' contention that the Commonwealth asserted inconsistent positions in its July 24, 2003 letters. With respect to the first letter, the Commonwealth indicated that in order to maintain the *status quo,* as required by law, it would not process longevity wage increases while no contract was in place. The Commonwealth was justified in its definition of the *status quo,* and our earlier discussion reveals that it was an accurate interpretation of the law. In its second letter the Commonwealth advised Complainants of a resolution by the PEBTF Board of Trustees changing the officers' health benefits. The Board agreed with the Commonwealth that, pursuant to the expired collective bargaining agreements, the PEBTF continued to have authority to manage health care benefits. This conclusion is supported by the fact that the PEBTF is a jointly administered, multi-union Health and Welfare Fund established pursuant to

a trust agreement between AFSCME and the Commonwealth. It was logical for the Commonwealth to presume that this provision involving third parties would remain in effect after the agreements expired. The Commonwealth's letters of July 24, 2003 do not evince a pretext for discrimination but, instead, correctly state the law regarding maintenance of the *status quo* with respect to wage increases and the officers' health care benefits.

## IV. CONCLUSION

After thorough consideration of the arguments raised by both Complainants and the Commonwealth, we conclude that the Board did not abuse its discretion or act with bad faith, fraud, or capricious action by refusing to issue an unfair practice complaint against the Commonwealth. First and foremost, the Board properly relied on our Supreme Court's decision in *Fairview School District v. Unemployment Compensation Board of Review*, 499 Pa. 539, 454 A.2d 517 (1982), to define the *status quo* between the parties during the interim period between collective bargaining agreements. We agree with the Board that the Commonwealth did not commit an unfair practice under Section 6(1)(a) or (e) of the PLRA by discontinuing the longevity wage increases provided for in the expired agreements. The policy reasons articulated by the Court in *Fairview* are equally compelling here and comport with Act 111's goal of fostering collective bargaining. We also find that the facts alleged by Complainants failed to demonstrate that the Commonwealth displayed anti-union *animus* or acted with an unlawful motive. The Board was therefore justified in dismissing Complainants' charge of discrimination under Section 6(1)(c) of the PLRA. Accordingly, we affirm the order of the Board dismissing Complainants' exceptions and affirming the decision of the Secretary.

**ORDER**

AND NOW, this 22nd day of July, 2004, the orders of the Pennsylvania Labor Relations Board dated November 18, 2003, in the above-captioned matter are hereby affirmed.