**CENTRAL DAUPHIN SCHOOL DISTRICT, Appellant**

v.

**CENTRAL DAUPHIN BUS DRIVERS' ASSOCIATION.**

Commonwealth Court of Pennsylvania.

Argued March 15, 2010.
Decided May 19, 2010.
As Amended Aug. 9, 2010.

Dean F. Piermattei and Stephen Moniak, Harrisburg, for appellant.

Jason M. Weinstock, Harrisburg, for appellee.

BEFORE: LEADBETTER, President Judge,[1] COHN JUBELIRER, Judge, and FLAHERTY, Senior Judge.

OPINION BY Judge COHN JUBELIRER.

Central Dauphin School District (the District) appeals from the order of the Court of Common Pleas of Dauphin County (trial court), which denied the District's complaint for declaratory relief (Complaint). The trial court denied the District's request for a declaration that the impasse procedures and timeframes of The Public Employe Relations Act, commonly known as Act 195,[2] applied to the mid-contract bargaining dispute between the District and the Central Dauphin Bus Drivers' Association (Association), and not the terms of the act commonly known as Act 88,[3] as asserted by the Association. On appeal, the District argues that the trial court erred as a matter of law by concluding that the mid-contract dispute here is governed by Act 88 and by holding

[1] This matter was argued before a panel consisting of Judge Cohn Jubelirer, Judge McCullough, and Senior Judge Flaherty. Following argument, Judge McCullough found it necessary to recuse and, on March 22, 2010, the case was reassigned to the authoring judge and submitted on briefs to President Judge Leadbetter for consideration as a member of the panel.

[2] Act of July 23, 1970, P.L. 563, *as amended*, 43 P.S. §§ 1101.101–1101.2301. Act 195 requires, inter alia, mandatory mediation and discretionary fact finding in labor disputes between public employers and bargaining units that have resulted in an impasse. School districts are included in the definition of "public employer" under Act 195 and "any individual employed by a public employer" is a "public employe" for the purposes of Act 195. Section 301(1), (2) of Act 195, 43 P.S. § 1101.301(1), (2).

[3] Act of July 9, 1992, P.L. 403, *as amended*, 24 P.S. §§ 11–1101–A—11–1172–A. Like Act 195, Act 88 is a labor relations law governing collective bargaining. However, Act 88 only applies where the "employer" is "a public school entity" including a "public school district" and the "employe" is "a public school employe who bargains collectively with a public school entity." Section 1101–A of Act 88, 24 P.S. § 11–1101–A. Act 88 increases reliance on mediation and fact finding and mandates final best-offer arbitration, and its timeframes are based on the public school calendar. The provisions of Act 88 that are directly relevant to this appeal are discussed in greater detail below.

that Act 88 repeals, in this particular case, the impasse procedures and timeframes set forth in Act 195. The District does not argue that it was not required to bargain over the proposed privatization of its transportation, (District's Reply Br. at 2), but contends that because Act 88 applies *only* to new or successor collective bargaining agreements, this mid-contract bargaining, and any disputes occurring mid-contract, are subject to the impasse procedures and timeframes of Act 195.

## I. Background

On September 8, 2008, the District and the Association entered into a collective bargaining agreement (2008 CBA) for transportation services for a three-year term.[4] In June of 2009, the District began exploring the possibility of privatizing its transportation services and issued a request for proposals from various vendors. On July 1, 2009, Durham School Services (Durham) sent a proposal to the District. Based on Durham's proposal, the District estimated that it could save approximately eleven million dollars over the next five years by privatizing its transportation services. The Association did not submit a proposal. Instead, the Association filed an unfair labor charge with the Pennsylvania Labor Relations Board (Board) on August 4, 2009, alleging that the District failed to provide it the information or provided it incomplete information necessary for bargaining on the issue of privatizing the District's transportation services.

On August 10, 2009, the District's School Board voted to accept Durham's proposal. The next day, August 11, 2009, the Association submitted the dispute to the Department of Labor and Industry, Bureau of Mediation (Department) for mandatory mediation pursuant to Act 88 and Act 195. On August 12, 2009, the District advised the Department of its position that the dispute resolution procedures under Act 88 did not apply here because the parties were not negotiating a new contract or a renewal contract. Thus, on August 14, 2009, the District filed a notice with the Department seeking to proceed with mediation under Act 195. A mediation session took place between the District and the Association on August 20, 2009.

The District and the Association attended hearings on the unfair labor practice complaint on August 27, 2009 and September 1, 2009. On September 2, 2009, the Association amended its unfair labor practice complaint to allege that the current mid-contract dispute should be resolved using the impasse procedures provided by Act 88 and that the District had not complied with Act 88. In response, the District filed a motion to dismiss, contending that the trial court, not the Board, had jurisdiction to determine whether Act 88 or Act 195 applies in these circumstances.

On October 14, 2009, while the unfair labor complaint was proceeding with the Board, the District filed its Complaint seeking the following declaration: "the collective bargaining timelines and impasse resolution procedures contained in [Act 88] do not apply to the parties' current dispute involving mid-contract bargaining over whether the District may contract out its transportation services to a private company." (Complaint ¶ 1, R.R. at 10a.) The Association filed its Answer With New Matter, opposing the declaration and asserting that Act 88 applies to the parties' mid-contract bargaining, as evidenced by

---

**4.** The Association was recognized and certified as the exclusive bargaining representative of the District's bus drivers by Nisi Order of Certification of the Pennsylvania Labor Relations Board dated October 1, 2007. (Nisi Order of Certification (Pa. Public Relations Bd. No. PERA–R–07–314–E, October 1, 2007), R.R. at 122a–24a.)

the unambiguous language of Act 88, the Nisi Order of Certification indicating that the parties were governed by Act 88, the parties' participation in Act 88 mediation, the use of a fact-finder as required by Act 88, and the Board's request for a written report pursuant to Act 88. (Answer With New Matter ¶¶ 79–80, 83–89, R.R. at 116a–18a.)

■ The trial court heard oral argument from the parties on November 10, 2009. After considering the parties' filings and arguments, the trial court issued a memorandum opinion on November 20, 2009 stating that it could not declare that the terms of Act 195 governed under these particular circumstances. The trial court noted, as a preliminary matter, that the District conceded that the definition of an "Employe Organization" under Act 88 includes school bus drivers. (Trial Ct. Op. at 2.) Then, after reviewing Act 88's language, the trial court concluded that there was no ambiguity in that language that would permit it to review the legislative history of the enactment of Act 88, which the District contended would support its position that Act 195, not Act 88, would apply here. (Trial Ct. Op. at 3.) Specifically, the trial court stated:

> In the absence of ambiguity in the language of a statute, this court may not consider other sources to inform its construction of that statute. Here, there is simply no ambiguity to be found. Indeed, at argument the District agreed that there was no language contained within Act 88 which would limit its application to the negotiation of initial or successor agreements. This court can find not a term, clause, or definition in

[Act 88] which is ambiguous in this respect.

(Trial Ct. Op. at 3.) Moreover, the trial court held that, even if it was to consider the legislative history (consisting of transcripts of the Senate floor debate), it still would not conclude that Act 195 applied here as such history "does not cement the District's position" because it "is only some evidence of legislative intent. It is not subject to enactment or presentment and represents only a keyhole view of the legislative process." (Trial Ct. Op. at 3–4.) The trial court held that the purpose of Act 88 was to prevent disruption of the school year and that this purpose "is best served by avoiding a construction which incentivizes mid-term termination of collective bargaining agreements as a means to obtain the less rigorous impasse procedures of Act 195." (Trial Ct. Op. at 4.) The District filed a notice of appeal and a statement of matters complained of on appeal with the trial court. By letter dated January 4, 2010, the trial court deferred to its November 20, 2009 memorandum opinion. The District now appeals to this Court.[5]

On appeal, the District asserts that the trial court erred and/or abused its discretion by concluding that Act 88 applies to the present mid-contract bargaining dispute and that the impasse procedures and timeframes of Act 195 are inconsistent with those of Act 88 and are, therefore, repealed to that extent. The District argues that the trial court's decision was in error because: (1) the express language of Act 88, specifically, Section 1152–A of Act 88, 24 P.S. § 11–1152–A, establishes that Act 88 applies only when parties are entering into a new collective bargaining agree-

---

5. In reviewing a trial court's decision on declaratory judgment, our review "is limited to determining whether the trial court's findings are supported by substantial evidence and whether the trial court committed an error of law or abuse of discretion." *City of Pittsburgh v. Bachner,* 912 A.2d 368, 371 n. 6 (Pa.Cmwlth.2006).

ment; (2) there is no provision in Act 88 making it applicable to negotiations involving privatization and the legislative history does not support the trial court's contrary interpretation; (3) the trial court should have deferred to the Board's decisions interpreting mid-contract disputes over privatization under Act 195, not Act 88; and (4) the trial court's construction of Act 88 would lead to absurd, illogical, and impracticable results.

## II. Act 195 and Act 88

Act 195, enacted in 1970, and Act 88, enacted in 1992 as an amendment to the Public School Code of 1949 (School Code),[6] contain similar provisions and procedures applicable to collective bargaining and the resolution of impasses or disputes that arise during the collective bargaining process.[7] The terms of Act 195 apply to all public employers and employees, and govern, among other things, the collective bargaining process, the resolution of collective bargaining impasses and disputes, and the filing and resolution of unfair labor practices complaints. In contrast, Act 88 describes the collective bargaining process between public school entities and those public school employees who bargain collectively, *Carroll v. Ringgold Education Association*, 545 Pa. 192, 200–01, 680 A.2d

1137, 1141 (1996), including the strike and lockout procedures. *See, e.g.*, Sections 1101–A, 1131–A, and 1132–A of Act 88, 24 P.S. §§ 11–1101–A (defining strike and lockout), 11–1131–A (prohibiting strikes in certain circumstances), and 11–1132–A (prohibiting lockouts in certain circumstances). In *Carroll*, our Supreme Court described Act 88 and its relationship with Act 195 as follows:

> Act 88 was enacted in 1992, as article XI–A of the Public School Code. *See* 24 P.S. §§ 11–1101–A through 11–1172–A. Act 88 provides for collective bargaining between public school entities and public school employes or employe organizations. Section 6 of Act 88 provides: '[Act 195] is to be read in pari materia with the addition of Article XI–A of [Act 88], but [Act 195] is repealed insofar as it is clearly inconsistent with the addition of Article XI–A of the Act.' (*See* 24 P.S. § 11–1101–A Historical and Statutory Notes.)

*Carroll*, 545 Pa. at 200, 680 A.2d at 1141 (footnote omitted). Act 88 governs strike and lockout procedures and prohibitions to those parties subject to that Act.

## III. The Express Language of Act 88

We begin by addressing the District's first argument in support of its contention

**6.** Act of March 10, 1949, P.L. 30, *as amended*, 24 P.S. §§ 1–101—27–2702.

**7.** The impasse procedures in Act 195 require mandatory mediation and authorize the Board, in its discretion, to appoint a factfinding panel, and allow the parties to voluntarily submit their impasse to binding arbitration panels at any time. Sections 801, 802, 804 of Act 195, 43 P.S. §§ 1101.801, 1101.802, 1101.804. The timeframes of Act 195 are set in relation to the "budget submission date" of the particular public employer. 43 P.S. §§ 1101.801, 1101.802. The impasse procedures of Act 88 require: mandatory mediation; the mandatory appointment of a factfinding panel at the request of one party; and

final best-offer arbitration. Sections 1121–A, 1122–A, 1125–A of Act 88, 24 P.S. §§ 11–1121–A, 11–1122–A, 11–1125–A. The timeframes associated with each step in Act 88's impasse procedures are based on their relation to June 30 or December 31, whichever is the end of the school entity's fiscal year. Finally, Act 88 states that the impasse timeframes of Act 88 are mandatory. Section 1126–A of Act 88, 24 P.S. § 11–1126–A. The parties do not appear to dispute that the impasse procedures and timeframes of Act 195 are inconsistent with those in Act 88 and that, if Act 88 were to apply to the present matter, the contrary impasse procedures and timeframes of Act 195 would be inapplicable.

that the impasse procedures and time-frames of Act 195 should govern the present mid-contract dispute. The District asserts that, because the plain language of Section 1152–A of Act 88 expressly limits Act 88's application to *new* contracts only, Act 195's impasse and mediation procedures are applicable here, where there is a mid-contract dispute.

■ When construing a statute, this Court "must first determine whether the issue at bar may be resolved by reference to the express language in the statute, which is to be read according to the plain meaning of [its] words." *Yost v. McKnight*, 865 A.2d 979, 982 (Pa.Cmwlth. 2005). Our Supreme Court has explained the prerequisites to statutory interpretation as follows:

> Where the intent of the legislature is clear from the plain meaning of the statute, courts must not pursue statutory construction. When the words of a statute are free from all ambiguity, we must not disregard the letter of the law under the pretext of pursuing its spirit. Only when the language of the statute is ambiguous does statutory construction become necessary.

*Ramich v. Workers' Compensation Appeal Board (Schatz Electric, Inc.)*, 564 Pa. 656, 662, 770 A.2d 318, 322 (2001) (citations omitted). With these principles in mind, we can consider whether the present dispute should be resolved under the impasse procedures and timeframes of Act 88 or Act 195.

Section 1152–A of Act 88, relied upon by the District, describes the effect given to those collective bargaining agreements in place at the time Act 88 became effective, stating:

> § 11–1152–A. Existing agreements; provisions inconsistent with article
>
> Any provisions of any collective bargaining agreement in existence on the effective date of this article which are inconsistent with any provision of this article, but not otherwise illegal, shall continue valid until the expiration of such contract. The procedure for entering into any new collective bargaining agreement, however, shall be governed by this article, where applicable, upon the effective date of this article.

24 P.S. § 11–1152–A. Similarly, Section 904 of Act 195, 43 P.S. § 1101.904, also cited by the District, addresses those collective bargaining agreements in place at the time Act 195 came into effect, providing:

> § 1101.904. Existing agreements; provisions inconsistent with act
>
> Any provision of any collective bargaining agreement in existence on January 1, 1970 which is inconsistent with any provision of this act but not otherwise illegal shall continue valid until the expiration of such contract. The parties to such agreements may continue voluntarily to bargain on any such items after the expiration date of any such agreement and for so long as these items remain in any future agreement.

43 P.S. § 1101.904. Both of these sections, which fall within the "Collective Bargaining Agreement" headings of Act 88 and Act 195, establish that, if there was a collective bargaining agreement in place at the time the new law was enacted that contained terms or provisions that were inconsistent with the new law (and not otherwise illegal), those collective bargaining agreements would continue until the end of the contract. The second sentence describes which, if any, of the inconsistent terms or procedures could be continued after the effective date of the new law. Under Act 195, the parties could continue to negotiate over terms already in existence, even if those terms were inconsis-

tent with Act 195, but could not expand those terms, i.e., expand a "modified-agency-shop provision" into a "strict-agency-shop provision." *Pennsylvania Labor Relations Board v. Zelem*, 459 Pa. 399, 404–05, 329 A.2d 477, 479–80 (1974). In contrast, Section 1152–A provides no exclusion to the Act 88 procedures for those contracts entered into after Act 88's effective date, July 9, 1992, i.e., "new" contracts, and, in fact, requires those contracts to be governed by Act 88. In *Zelem*, our Supreme Court described Section 904 of Act 195 as a "'grandfather' provision[ ]." *Id.* at 403, 329 A.2d at 479. A "grandfather clause" is defined as "[a] provision that creates an exemption from the law's effect for something that existed before the law's effective date." Black's Law Dictionary 767 (9th ed. 2009). Because Section 1152–A sets forth how to treat collective bargaining agreements in place at the time Act 88 was enacted, just as Section 904 does for Act 195, we consider it also a grandfather provision.

However, we disagree with the District that the grandfather provision, Section 1152–A, establishes the scope or application of the terms and procedures of Act 88. Rather, the purpose of that Section, like grandfather provisions in general, was to guarantee that the contracts existing on the effective date of Act 88 remained valid until their expiration. Thereafter, the parties would have to abide by the collective bargaining terms and procedures of Act 88. We believe that, had the General Assembly wanted to restrict the scope or application of Act 88 only to new contracts,

it would not have placed that restriction in a grandfather provision.

■ The District next argues that there are no express provisions in Act 88 which provide that it applies to mid-contract disputes. However, after our examination of Act 88, we disagree. Section 1111–A describes the scope of the collective bargaining obligations under Act 88, stating:

§ 11–1111–A. Mutual obligation

Collective bargaining is the performance of the mutual obligation of the employer or his representative and the representative of the employes to meet at reasonable times and confer in good faith [8] with respect to wages, hours and other terms and conditions of employment or *the negotiation of an agreement or any question arising thereunder* ... but such obligation does not compel either party to agree to a proposal or require the making of a concession.

24 P.S. § 11–1111–A (emphasis added). Included within the scope of collective bargaining under this section of Act 88 is bargaining over wages, hours, and other terms or conditions of employment; and the negotiation of an agreement, as well as the negotiation of *any questions arising under those collective bargaining agreements.* Thus, according to the plain language of Section 1111–A, Act 88 applies to a dispute which arises during the public school employers' and employees' negotiations of questions that arise under their collective bargaining agreement. At issue in this case is a question about the privatization of work that is currently being performed by the bargaining unit. We have

---

8. This Court has stated that:
   Good faith bargaining requires the parties to make a serious effort to resolve differences and to reach common ground. The duty to bargain in good faith extends to the subject of moving bargaining unit work to a private contractor. Therefore, an em-

ployer must bargain to a bona fide impasse before contracting away bargaining unit work.
*Snyder County Prison Board v. Pennsylvania Labor Relations Board*, 912 A.2d 356, 364 (Pa.Cmwlth.2006) (citations omitted).

examined this issue before, in the context of Act 195, and determined that such a question is one that arises under the existing collective bargaining agreement.

In *Snyder County Prison Board v. Pennsylvania Labor Relations Board,* 912 A.2d 356 (Pa.Cmwlth.2006), a case involving an Act 195 public employer and employes, this Court treated the question of whether the public employer could privatize bargaining unit work during an existing agreement [9] as a question arising under that existing collective bargaining agreement. Although *Snyder County* involved an appeal from unfair labor charges, we held that the public employer in that case was required to bargain in good faith until the parties reached an impasse, and that such bargaining included the obligation to exhaust the impasse procedures of Act 195. *Snyder County,* 912 A.2d at 364–67. *See also Delaware County Prison Employees Independent Union v. Delaware County,* 681 A.2d 843, 850 (Pa.Cmwlth.1996) *(Delaware County I)* (holding, *inter alia,* that the public employer and employees had to exhaust the impasse procedures of Act 195 to satisfy their obligation to collectively bargain over the privatization of bargaining unit work), *rev'd on other grounds,* 552 Pa. 184, 713 A.2d 1135 (1998) (plurality) *(Delaware County II ).*[10]

Here, the District and the Association negotiated a collective bargaining agreement, the 2008 CBA, pursuant to Act 88 and the question here, as it was in *Snyder County,* is whether the District can, during the term of the existing 2008 CBA, privatize bargaining unit work. We note that the District concedes that the privatization of bargaining unit work is a mandatory subject of bargaining which must be negotiated. (District's Reply Br. at 2.) We agree with the trial court and the Association that this question arises under the 2008 CBA, which sets forth the employment terms, conditions, and obligations between the District and the Association until the 2008 CBA expires in June 2011. Accordingly, we conclude that this dispute falls within the ambit of Act 88's collective bargaining obligations. Because the dispute falls within the ambit of the Act 88 collective bargaining obligations, and Act 88 establishes impasse procedures and timelines that must be followed, this dispute should be resolved by using the impasse procedures and timeframes set forth in Act 88.

The other provisions of Act 88, including the impasse procedures themselves, like-

**9.** In *Snyder County,* the collective bargaining agreement was to expire on January 31, 2005, but the public employer began considering privatizing certain bargaining unit work in May 2004 and executed an agreement with the private contractor effective October 1, 2004. *Snyder County,* 912 A.2d at 358–59.

**10.** In *Delaware County I,* the public employer advised its employees, prison guards, on July 31, 1995 that they were to be permanently laid off on September 30, 1995. *Id.* at 845. The collective bargaining agreement in *Delaware County I* was to expire on March 31, 1996. *Id.* Ultimately, the Supreme Court held in *Delaware County II* that the privatization of the bargaining unit work was not an unfair labor practice, as found by the arbitrator and affirmed by this Court, because the collective bargaining agreement contained a provision that expressly authorized the public employer to subcontract out bargaining unit work. *Delaware County II,* 552 Pa. at 188–89, 713 A.2d at 1137. Thus, the Supreme Court did not address the part of this Court's holding in *Delaware County I* requiring the parties to exhaust the impasse procedures of Act 195 to satisfy their obligation to collectively bargain under Act 195. Neither the 2008 CBA nor the collective bargaining agreement in *Snyder County Prison Board v. Pennsylvania Labor Relations Board,* 912 A.2d 356 (Pa.Cmwlth. 2006) contained a provision expressly allowing the public employer to subcontract out bargaining unit work. *Id.* at 358–59 & n. 3.

wise do not restrict the application of Act 88 to disputes that arise only during the negotiation of a new contract. Under the section entitled "Collective Bargaining Impasse," Act 88 describes the procedures for resolving impasses in a step-by-step manner. Sections 1121–A through 1126–A of Act 88, 24 P.S. §§ 11–1121–A—11–1126–A. Each step is interrelated and builds upon the preceding step. Section 1121–A(a) of Act 88, 24 P.S. § 11–1121–A(a), states that, if "after a reasonable period of negotiation, a dispute or impasse exists between the representatives of the employer and the employe organization" the parties may submit to voluntary mediation. 24 P.S. § 11–1121–A(a). Section 1121–A(a) further provides that if "no agreement is reached between the parties within forty-five (45) days after negotiations have commenced, *but in no event later than one hundred twenty-six (126) days prior to June 30 or December 31, whichever is the end of the school entity's fiscal year,*" the dispute or impasse must be submitted to mandatory mediation if mediation has not already been utilized. 24 P.S. § 11–1121–A(a) (emphasis added). The timeframes discussed in Section 1121–A(a) are not limited to those fiscal years in which a collective bargaining agreement is set to expire, but are related to the end of the public school's fiscal year generally. Section 1122–A similarly does not link the deadlines for requesting the mandatory appointment of a fact-finding panel to the end of the term of a collective bargaining agreement, but to the end of the public school's fiscal year in general. 24 P.S. § 11–1122–A.

Finally, as pointed out by the Association, the language of Section 1111–A, defining the scope of bargaining under Act 88, is identical to that contained in Section 701 of Act 195.[11] Although the language defining the scope of collective bargaining is the same, the General Assembly set forth more stringent impasse procedures for the resolution of collective bargaining disputes and impasses involving public school employers and employees by requiring more mandatory steps and basing the timing of each step to account for the specific dates associated with the public school's fiscal year. By keeping the scope of collective bargaining under Act 195 and Act 88 the same, but altering the impasse procedures to account for the time restrictions associated with the school year, we conclude that the General Assembly intended that if a dispute or impasse would otherwise fall within the scope of Act 195, but involved a public school employer and public school employees, the matter should be resolved using the very specific procedures established by Act 88, and not the more general impasse procedures applying to all public employers set forth in Act 195.

## IV. Whether Act 88 is Ambiguous

The District's second, and alternative argument, is that Act 88 is ambiguous because it does not expressly address whether its impasse procedures and timeframes apply to mid-term bargaining over privatization. Based on this ambiguity, the District asserts that this Court must resort to the principles of statutory con-

---

11.  43 P.S. § 1101.701. Section 701 states:
    Collective bargaining is the performance of the mutual obligation of the public employer and the representative of the public employes to meet at reasonable times and confer in good faith with respect to wages, hours and other terms and conditions of employment, or the negotiation of an agree-
ment or any question arising thereunder and the execution of a written contract incorporating any agreement reached but such obligation does not compel either party to agree to a proposal or require the making of a concession.
43 P.S. § 1101.701.

struction to ascertain the legislature's intent, such as the contemporaneous legislative history, which the District contends establishes that Act 88 was not meant to apply to mid-contract disputes over privatization.[12] The District also maintains that this legislative history indicates that the sole purpose of Act 88 was to prevent teachers from striking, which is not served by requiring the use of Act 88's impasse procedures in a mid-contract dispute involving school bus drivers.

As previously noted, "[w]here the intent of the legislature is clear from the plain meaning of the statute, courts must not pursue statutory construction." *Ramich* at 662, 770 A.2d at 322. Although we have concluded that it is clear from the plain meaning of Act 88 that it applies to mid-contract disputes involving questions arising under the collective bargaining agreements, we would arrive at the same result under the principles of statutory construction.

Act 88 was enacted by the General Assembly after it determined that Act 195 was not having the desired effect of preventing public school employees, mainly teachers, from striking, thereby infringing upon a school's ability to provide the required 180 days of instruction. *See* Kathleen S. Herbert, *Balancing Teachers' Collective Bargaining Rights with the Interests of School Districts, Students and Taxpayers: Current Legislation Strikes Out*, 99 Dick. L.Rev. 57, 60, 66, 70–71 (1994) (discussing the history of Act 88).

Act 88 represented a compromise between parents, public school employees, and public school employers. *Id.* at 70–71. This compromise is evidenced by the "well-structured timetables for negotiations," enhanced mediation requirements, the opportunity for a single side to require fact finding, and was intended to facilitate the early resolution of contract disputes. *Id.* at 74.

The Board is correct that the legislative history indicates that one purpose of Act 88 was to limit public school teachers from striking. However, the language and legislative history of Act 88 indicate that the Legislature was more broadly focused on preventing the disruption of the school year and ensuring that public school students receive the 180 days of instruction required by Section 1501 of the School Code, 24 P.S. § 15–1501, *regardless of the cause of the delay*. We note that Act 88 includes *all* public school employees that bargain collectively, not just teachers, in its definition of "employe," 24 P.S. § 11–1101–A,[13] and addresses both employee strikes and employer lockouts. *See* Sections 1131–A, 1132–A of Act 88, 24 P.S. §§ 11–1131–A, 11–1132–A (prohibiting employee strikes and employer lockouts in certain circumstances). There is no provision in Act 88 that prohibits either a public school employer from engaging in a lockout or an employee organization from engaging in a strike during the term of a collective bargaining agreement. Recog-

---

**12.** The District cites as support the statements made by Senator Greenwood, who spoke extensively on school strikes in Pennsylvania and who stated, *inter alia*, "[t]he bill, very briefly, would require that in a school year where the contract is due to expire, by February 1st of that year, if the school board and the union have not come to an agreement on a contract, then they must submit to mediation." 1991 Leg. J. Senate 872–873 (state-

ment of Sen. Greenwood on Third Consideration Calendar of S.B. 727 (Pr. No. 770)) (Reproduced in R.R. at 163a–64a.)

**13.** The definition of "employe" in Act 88 does exclude management-level employees of other school districts or those employees covered by the Pennsylvania Labor Relations Act, Act of June 1, 1937, P.L. 1168, *as amended*, 43 P.S. §§ 211.1–211.39, or the National Labor Relations Act, 29 U.S.C. §§ 151–169.

nizing that public school employee strikes and public school employer lockouts can occur at any time, not just at the beginning or end of a contract, Act 88, as discussed above, does not limit its impasse procedures to those years in which a collective bargaining agreement expires, but bases its timeframes on the expiration of the public school's fiscal year generally. *See* 24 P.S. §§ 11–1121–A, 11–1122–A. Act 88's impasse procedures require multiple mandatory steps, each building upon one another, to resolve disputes and impasses before an employee strike or employer lockout will prevent students from receiving the 180 days of instruction required by Section 1501 of the School Code. In fact, Section 1125–A(b) of Act 88 requires that, if either a strike or a lockout would prevent a school entity's ability to provide the mandatory 180 days of instruction by June 15, or by the last day of the public school employer's scheduled school year, the parties are obligated to return to work and engage in final best-offer arbitration. 24 P.S. § 11–1125–A(b). Further, the Secretary of Education may seek injunctive relief, pursuant to Section 1161–A of Act 88, 24 P.S. § 11–1161–A, if an employee organization strike endangers the 180 days requirement.

■ In light of these provisions, we agree with the trial court that Act 88 is designed to ensure that students receive 180 days of instruction by requiring early negotiation and following the impasse procedures for all parties covered by its collective bargaining requirements. We also agree with the trial court that this purpose would not be served by treating issues subject to mandatory collective bargaining, such as the privatization of bargaining unit work, differently if the changes are pro-

posed mid-contract, near the end of a contract, or applying Act 88 only to disputes involving teachers.

## V. Deference to the Board's Prior Decisions

■ Next, the District asserts that the trial court erred by not giving due deference to certain decisions by the Board, which the District argues support its conclusion that the bargaining timelines and impasse procedures of Act 88 do not apply to mid-term bargaining over the privatization of bargaining unit work. Specifically, the District cites *North Pocono Education Support Personnel Association v. North Pocono School District*, 39 PPER 44 (Pa. Labor Relations Bd. April 15, 2008) (*North Pocono*); *Upper Merion Education Association v. Upper Merion Area School District*, 30 PPER (LRP) P30,091 (Pa. Labor Relations Bd. April 20, 1999) (*Upper Merion*); and *Philadelphia Federation of Teachers, Local 3 v. Philadelphia School District*, 29 PPER (LRP) P29,085 (Pa. Labor Relations Bd. March 24, 1998) (*Philadelphia Federation of Teachers*), as support for the proposition that the privatization of bargaining unit work is governed by the timeframes and impasse procedures of Act 195. Again, we must disagree.

Although the District is correct that courts are to afford great deference to the administrative expertise of the Board, *Pennsylvania State Park Officers Ass'n v. Pennsylvania Labor Relations Board*, 854 A.2d 674, 682 n. 13 (Pa.Cmwlth.2004), the Board decisions relied upon by the District are distinguishable. These cases all involved the filing of unfair labor practice complaints, which are filed pursuant to Act 195.[14] Because Act 88 focuses only on the

14. Section 1201 of Act 195, 43 P.S. § 1101.1201, defines what constitutes unfair

labor practices by a public employer. That section states:

collective bargaining relationship between public school employers and employees, it contains no procedures or remedies for unfair labor practices. Consequently, there is nothing in Act 88 for Act 195's unfair labor practice procedures to be clearly inconsistent with; therefore, Act 195's procedures and remedies for unfair labor practices are read in pari materia with Act 88. *Carroll* at 200, 680 A.2d at 1141. Accordingly, the Board cited Act 195 in discussing them. It is true that, in reviewing the substance of the complaints, the Board did not discuss Act 88 in the cases cited by the District; however, the collective bargaining violations at issue in those cases were not specific to Act 88. For example, in *North Pocono*, the public school employer unilaterally reassigned a bargaining unit employee into a non-unit position and assigned her work that was previously performed by the bargaining unit without engaging in *any* negotiations or bargaining over the transfer. While it might have been appropriate to reference Act 88 in the discussion, it was not necessary because the general requirement to negotiate before unilaterally engaging in the action taken here is found in both Act 195 and Act 88. Similarly, in *Philadelphia Federation of Teachers*, the public employer unilaterally subcontracted certain teaching positions without *ever* bargaining or negotiating on the issue or even advising the union that it was considering subcontracting those positions. Thus, like *North Pocono*, the employer's failure to engage in *any* bargaining or negotiations on the issue would have violated both Act 88 and Act 195. In *Upper Merion*, the issue involved the furlough of two teachers which the union claimed occurred because of discrimination based on comments made by the union president and anti-union animus resulting from comments made by a representative of the public employer. However, *Upper Merion* contained no allegations that the employer violated its obligation to collectively bargain; thus, there was no need for the Board to consider the different collective bargaining provisions of Act 88 and Act 195. We do not believe that the Board intended to limit the scope of Act 88 by citing to Act 195, and not to Act 88, in these decisions, which focused on general collective bargaining requirements found in both Acts. Thus, the trial court did not err in its interpretation of those decisions.

(a) Public employers, their agents or representatives are prohibited from:
(1) Interfering, restraining or coercing employes in the exercise of the rights guaranteed in Article IV of this act.
(2) Dominating or interfering with the formation, existence or administration of any employe organization.
(3) Discriminating in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any employe organization.
(4) Discharging or otherwise discriminating against an employe because he has signed or filed an affidavit, petition or complaint or given any information or testimony under this act.
(5) Refusing to bargain collectively in good faith with an employe representative which is the exclusive representative of employees in an appropriate unit, including but not limited to the discussing of grievances with the exclusive representative.
(6) Refusing to reduce a collective bargaining agreement to writing and sign such agreement.
(7) Violating any of the rules and regulations established by the board regulating the conduct of representation elections.
(8) Refusing to comply with the provisions of an arbitration award deemed binding under section 903 of Article IX.
(9) Refusing to comply with the requirements of "meet and discuss."
Section 1201 of Act 195, 43 P.S. § 1101.1201. Although there have been unfair labor practice allegations made and claims filed with the Board, those questions are not before this Court at this time.

## VI. Ability of a school district to make timely decisions

Lastly, the District argues that, because "[t]he trial court's construction of Act 88 would limit school districts' ability to make timely decisions which may affect bargaining rights of employees to only January of a given year," the trial court's interpretation is too broad and leads to impracticable, illogical, and absurd results and, thus, is contrary to Sections 1921(c)(6) and 1922(1) of the Statutory Construction Act of 1972, 1 Pa.C.S. §§ 1921(c)(6) (stating that courts should consider "[t]he consequences of a particular interpretation") and 1922(1) (stating the it is presumed that the General Assembly does not intend an absurd or unreasonable result). (District's Br. at 24.) According to the District, the trial court's interpretation of Act 88 would require a school district seeking to make a change, based on safety or economic reasons, to wait until January of a given year before it could begin bargaining over that issue and precludes school districts around the Commonwealth "from making timely economic decisions which may affect the bargaining rights of any public employee eleven out of twelve months of the year." (District's Br. at 25.)

Our review of Act 88 does not reveal any limitations on when a school district may *begin* bargaining with its employees but, rather, focuses on preventing impasses and bargaining disputes from affecting the public school's ability to provide the 180 days of instruction required by Section 1501 of the School Code. To meet this goal, Act 88 sets deadlines for when the parties must *stop* bargaining on their own and seek out the assistance of, *inter alia,* mediators, fact finders, and arbitrators in an effort to resolve the dispute or impasse. For example, Section 1121–A(a) governs when parties must avail themselves of the first step of Act 88's impasse procedures,

mandatory mediation. That section provides, in relevant part:

> (a) If, after a reasonable period of negotiation, a dispute or impasse exists between the representatives of the employer and the employe organization, the parties may voluntarily submit to mediation, *but, if no agreement is reached between the parties within forty-five (45) days after negotiations have commenced, but in no event later than one hundred twenty-six (126) days prior to June 30 or December 31, whichever is the end of the school entity's fiscal year, and mediation has not been utilized by the parties, both parties shall immediately in writing call on the service of the Pennsylvania Bureau of Mediation.*

24 P.S. § 11–1121–A(a) (emphasis added). Thus, Section 1121–A(a) sets forth a timeline for when the parties must seek out mandatory mediation if they have failed to resolve their dispute or impasse after reasonable negotiations on their own. We have not found, and the District has not directed us to, another section of Act 88 that requires that a school district wait until January *before* bargaining over any particular issue or places any limit on when bargaining over a particular subject must *commence*.

The District asserts that the trial court's construction of Act 88 produces absurd results and asks this Court to consider the mischief that was intended to be remedied by Act 88, teacher's strikes, as well as its goals to save its taxpayers' money in determining whether Act 88 applies here. However, to construe Act 88 in the manner proposed by the District would not further the purpose of Act 88 to ensure 180 days of instruction through the use of specialized bargaining and contract dispute resolution procedures and timeframes for public school employers and employees. Although we commend the District

for trying to save its taxpayers money by privatizing its transportation services, the District has an existing bargaining agreement with the Association and, as such, it must follow the mandatory procedures set forth by Act 88 in its efforts to meet that commendable goal.

For the foregoing reasons, we must conclude that the trial court did not err in holding that Act 88, not Act 195, governs the present dispute. Accordingly, the order of the trial court is affirmed.

Judge BROBSON and Judge McCULLOUGH did not participate in the decision of this case.

## ORDER

NOW, May 19, 2010, the order of the Court of Common Pleas of Dauphin County in the above-captioned matter is hereby **AFFIRMED.**